## Alvin Schulze v. George W. Jalonick et al.

### Decided November 25, 1896.

**1. Libel—Colloquium and Innuendo—Pleading Held Sufficient.**

See petition in suit for libel in publishing a pamphlet of advisory insurance rates describing certain premises in a town where the sale of intoxicating liquors was prohibited as follows, "Owner, Alvin Schulze, Occupancy, Blind Tiger," alleged by colloquium as referring to plaintiff and by innuendo as charging him with keeping an establishment for unlawful sale of liquors, held sufficient to authorize the admission of evidence to show such reference and meaning.

**2. Same—Evidence Admissible—Understanding of Witness.**

Testimony of persons acquainted with the circumstances, that from reading this language they applied it to plaintiff Schulze as the party charged with such unlawful acts should have been admitted.

**3. Same—Understanding of Others—Notoriety.**

A witness could not state the understanding of others as to who or what was meant, but could state that the matter,—that plaintiff was so charged,—became notorious in the community.

**4. Same—Meaning of "Blind Tiger."**

What was meant by keeping a "Blind Tiger" was also subject of proof by persons who could testify as to its meaning.

**5. Same—Injury to Reputation.**

Testimony showing injury to plaintiff's character and standing in the community by such publication was also admissible.

Appeal from the District Court of Hays County. Tried below before Hon. H. Teichmueller.

A previous appeal in this case is reported in 29 S. W. Rep., 193.

*Gustave Cook* and *Owen Ford*, for appellant.—The court erred in excluding from the jury the evidence of the witnesses Faris, Wood and Watson, for the reason that such evidence was pertinent, under the allegations in plaintiff's petition, to show who was meant to be charged by the defendants in said rate publication in evidence on this trial, with the criminal offense of keeping a blind tiger, who said witnesses from reading said book understood was meant to be charged with said offense, who the community generally understood to be charged by the defendants with said criminal offense, and the effect said charge had on the character, reputation and standing of plaintiff in the community. 13 Am. and Eng. Ency. of Law, 392, 393, 495 and notes; Newell on Defamation, 259, sec. 24; Schulze v. Jalonick, 29 S. W. Rep., 193; Bradstreet v. Gill, 72 Texas, 118; Belo v. Wren, 63 Texas, 699.

The court erred in this cause in instructing the jury to find for the defendants, and in not submitting the case to the jury upon the evidence, for the reason that the statement in the book in evidence, in the absence of a statement in said book by the defendants that some person other than plaintiff was the occupier of said house, carried the natural and

legal presumption and intendment that plaintiff was the occupant of said house and the keeper of a blind tiger. Wharton on Ev., secs. 1285, 1286; 19 Am. and Eng. Ency. of Law, 79.

*Leake, Henry, Reeves & Greer*, for appellees.—We understand that this court reversed the judgment in this cause, when it was before it upon the first appeal, upon the ground that the innuendo was sufficient to admit of proof by the appellant that the publication was intended to injure, and would be understood by those who read it to refer to the appellant. This court did not decide nor undertake to say what would be competent evidence to prove that fact; nor did this court, in the former opinion, decide that it would be sufficient for appellant to prove merely that it was the intention of the writer or circulator of the publication to charge, or to have it understood, that the appellant was the occupant of the building. What we think this court did decide, and plainly express in its opinion, was that the innuendo was a sufficient pleading to admit the plaintiff to introduce in evidence extraneous facts tending to show that a reader of the publication, in possession of such extraneous facts, would understand that the plaintiff was the person referred to. Such, we think, is the law.

COLLARD, ASSOCIATE JUSTICE.—This is a suit by the appellant, Alvin Schulze, against the appellees, George W. Jalonick and the Pennsylvania Fire Insurance Company, for libel.

The petition is as follows: "That plaintiff has always been, and is now, an honest and law-abiding citizen, and has always up to about the 30th day of June, 1892, borne a good reputation as such amongst all the good people of Hays County, Texas, where he was and is widely and generally known. That the defendants, well knowing the premises, contriving and designing to injure and destroy plaintiff's good name, as aforesaid, and to vex, harrass and annoy him in mind, and put him in fear and apprehension of criminal prosecution, knowingly, intentionally and without probable cause, did falsely and unlawfully, on or about the 30th day of June, 1892, in the county of Hays, aforesaid, print, publish, utter and circulate, in a certain pamphlet, a copy of which is attached hereto and made a part hereof, marked Exhibit 'A', entitled 'Vol. 80. Advisory Rates for San Marcos, Texas (Second Class), June 30, 1892,' of and concerning plaintiff, the following false, slanderous and defamatory words, to-wit: 'Map No. Block 13, South Side Square, Owner, Alvin Schulze (meaning this plaintiff), Occupancy, Blind Tiger. Stories 1. Class B. Gr. (meaning ground) Floor, Oc. (meaning occupied). Rates. Bldg. (meaning building) 2.50, Cont. (meaning contents) 2.25,' meaning thereby and charging plaintiff with the immoral and criminal offense of keeping a place in which intoxicating liquors were sold by device, whereby he, plaintiff, delivering same, was concealed from persons buying, and to whom the same was delivered, in his one-story building, Block No. 13, on the south side of

Court House Square in San Marcos, Texas, where the sale of intoxicating liquors was prohibited by the laws of the State, which defendants then and there knew was false, slanderous and untrue, concerning plaintiff, whereby plaintiff's good name, credit and reputation as an honest man and law-abiding citizen, amongst the good people of Hays County aforesaid, has been greatly impaired and injured, and his peace of mind greatly disturbed, and his feelings greatly vexed, harassed and annoyed, causing him great mental suffering and distress, and serious apprehension of criminal prosecution, to his damage five thousand dollars.

"And plaintiff further alleges that the defendants, unlawfully and wrongfully, intentionally and maliciously, contriving and designing to injure, slander and defame plaintiff as aforesaid, and to destroy his good credit and good name as an honest and law-abiding citizen as aforesaid, amongst the good people of Hays County as aforesaid, and to vex, harass, annoy and distress plaintiff in his mind and feelings as aforesaid, and create in him serious apprehension of criminal prosecution, did, on or about the 30th day of June, 1892, maliciously, knowingly, willfully and without probable cause, falsely and unlawfully, in the county of Hays aforesaid, of and concerning plaintiff, print, publish, utter and circulate a certain pamphlet, the same hereto attached, entitled 'Vol. 80. Advisory Rates for San Marcos, Texas (Second Class), June 30, 1892,' of and concerning plaintiff, the following false, slanderous and defamatory words, to-wit: (Map No. Block 13, South Side Square, Owner Alvin Schulze (meaning this plaintiff), Occupancy Blind Tiger. Stories 1. Class B. Gr. (meaning ground) Floor Oc. (meaning occupied). Rates. Bldg. (meaning building) 2.50, Cont. (meaning contents) 2.25,' meaning and thereby charging plaintiff with the immoral and criminal offense of keeping a place in which intoxicating liquors were sold by device, whereby he, plaintiff, delivering same, was concealed from persons buying, and to whom the same was delivered, in his one-story building, Block 13, on the south side of Court House Square in San Marcos, Texas, where the sale of intoxicating liquors was prohibiting by the laws of the State, which defendants then and there knew was false, slanderous and untrue concerning plaintiff, whereby plaintiff's good name, credit and reputation as an honest man and law-abiding citizen, amongst the good people of Hays County as aforesaid, has been greatly impaired and injured, and his peace of mind greatly disturbed, and his feelings greatly vexed, harassed and annoyed, causing him great mental suffering and distress, and serious apprehension of criminal prosecution, wherefore plaintiff is entitled to exemplary and vindictive damages in the further sum of, to-wit, five thousand dollars.

"Plaintiff, therefore, sues and prays citation to defendants according to law, to answer this petition, and that he have judgment for his damages aforesaid, and for costs, and for all relief, general and special, to which he may be entitled in law and equity, and as in duty bound, etc."

George W. Jalonick was an Insurance Surveyor and Rate Manager

of the Texas Survey and Rating Bureau.   His duties were to make rates on all business property and special hazards—flour mills, oil mills and saw mills.   He used an insurance map showing the business portion of every town in Texas, and had one of San Marcos, Hays County.   He took this map and visited such places of business, marking the occupancy of each of the buildings as he came to them, noting changes made since the map was published and the character of the buildings—whether brick, frame, stone, etc.—and then made up rates, published them, and furnished them to insurance companies, who pay for them.   These rates are published in a pamphlet, a convenient form for use of insurance agents, one of which is attached to plaintiff's petition, marked "Exhibit A."   The map contains approximately the same information. The object of the pamphlet is to secure uniform rates and meet the desires of fire insurance companies in securing a fair price for carrying a risk.   The insurance companies use these rates and descriptions in issuing polices.   The occupancy determines the rate to some extent.   The pamphlet has blanks for the map number, owner, occupancy, stories, class, rates, etc., and it placed plaintiff's building as follows:   Map No. 747, Owner, Alvin Schulze; Occupancy, Blind Tiger, etc., describing the building, rating it for insurance, etc.   This is the rating, ownership and occupancy mentioned in plaintiff's petition.

The defendant fire insurance company filed exceptions to the petition, denial that it printed or published the alleged libel or had any concern with it, except to purchase the pamphlet for proper information of its agents in conducting its business, and did not communicate the same, except to its agents, who were acting for it in conducting its insurance business.

The defendant Jalonick filed a plea of not guilty.

The court below charged the jury that the alleged publication, unexplained, is not reasonably, and as matter of law, susceptible of the interpretation imputed to it by plaintiff, and "In the absence of any evidence tending to show peculiar attending circumstances, in the light of which the peculiar matter would be liable to have the meaning ascribed to it, and in the absence of evidence showing or tending to show any evil or malicious intent on the part of defendants, the cause of action as alleged by plaintiff is not supported by evidence and he is not entitled to recover.   You are therefore instructed to return a verdict for the defendants."

The jury returned a verdict according to the direction in the court's charge, upon which judgment was rendered for defendants, from which plaintiff has appealed.

*Opinion.*—The first assignment of error is addressed to the ruling of the court in excluding the testimony of several witnesses, to which exceptions were reserved.

The bill of exception is as follows: "Be it remembered, that upon the trial of this cause the plaintiff offered to prove the following facts by

the witnesses N. K. Faris, Daniel Watson and Ike Woods, who, being thereto interrogated, would have testified:

"Faris. By Blind Tiger I understand was meant selling liquors in violation of law. I understood by the publication they were selling whiskey in the house styled 'Alvin Schulze, Blind Tiger,' in the book. My understanding of 'Blind Tiger' Schulze was selling intoxicating liquors in violation of law in his building. I understood Schulze was running a 'Blind Tiger'—that is, selling liquor contrary to law. I had a conversation with Mr. Watson since he showed me the book, one similar to the one here shown me, and I understood from the reading of the publication in the book that it charged Schulze with keeping and · running a 'Blind Tiger,' and other persons I talked with understood it the same way, and the understanding of this community, so far as I know, was that it—the book—charged Schulze with running a 'Blind Tiger.' The understanding of the community, so far as I know, was that Schulze was running a 'Blind Tiger.' I have heard the matter of Schulze running a 'Blind Tiger' spoken of in the community often and in that particular language. It was discussed in this community. I have heard this matter of Schulze running a 'Blind Tiger' discussed in the community here. Mr. Watson and I talked about Schulze being accused of running a 'Blind Tiger.' The impression in the community was that Schulze was charged with selling liquor in his place on the south side of the square. The understanding in the community from the publication was that Schulze was running a 'Blind Tiger' in his building. I heard no other opinion than that. It was extensively and frequently discussed in this community and the interpretation given to it was that it was 'Schulze's Blind Tiger.' Other people, living away from here, heard of and spoke about it. I heard it discussed in the community that Schulze was running a 'Blind Tiger.' That is what I heard discussed. I heard it before and since the filing of this suit. I saw the book similar to this book before this suit was brought. I heard the publication discussed before this suit was brought. As to the charge of Schulze keeping a 'Blind Tiger,' I have talked with several parties about the publication. At the time of the discussion they would say in this community, Schulze is running a 'Blind Tiger.' I never heard anyone read the book except Mr. Watson and Peters. I talked with others who said they had read the book. This talk was before the suit was brought. I don't know whether Mr. Peters was an insurance agent or not. I heard several talk besides Peters about the publication before the suit was brought, but don't remember who they were. I don't know if these parties had a book or not. I don't know if there is another book similar to this book. If there are any others except those shown me by Peters and Watson, I never saw them. I do not know if any one discussing the book had it open or not. Mr. Watson and Peters discussed it with me and showed a similar publication to this. They read it across. I read it across. I saw the book. I read in it the publication 'Alvin Schulze, Blind Tiger.' I never saw any one with it except Watson and Peters.

The ones they showed me were similar to this. The effect of the publication upon Schulze in this community was injurious. The publication affected Schulze in this community as a law-abiding citizen. I have known Schulze in this community about fifteen years and never heard him charged with keeping a 'Blind Tiger' here before this publication charged him with it. He has been charged with keeping a 'Blind Tiger' in the publication of this book. I have heard him frequently charged with keeping a 'Blind Tiger' since the publication of this book, which resulted from the publication of this book. I have heard him frequently charged with keeping and running a ''Blind Tiger' since the publication of the book.

"Plaintiff asked said above named witnesses the following questions, and expected them to answer as follows:

"Q. What effects, if any, upon the reputation and standing of Mr. Schulze in this community had the publication?

"A. It was injurious.

"Q. Did the publication which you have cited there, the one alleged in the petition, affect at all the reputation of Mr. Schulze in this community as a law-abiding citizen?

"A. It did affect him as a law-abiding citizen in this community.

"Q. Before the publication did you ever hear the plaintiff, Alvin Schulze, charged with the offense of keeping a 'Blind Tiger' in this county?

"A. I did not.

"Daniel Watson testified substantially to the same facts as Faris. Ike Woods testified in substance the same as Faris, with this addition, that he had seen the Mrs. Manlove's and Walter Dugger's books. And plaintiff expected each of said witnesses Wood and Watson to answer the above questions the same as he expected Faris would have done.

"To the introduction of which evidence by plaintiff, as well as the answers to the above and foregoing questions which he sought to introduce, the defendants objected, on the ground that they were irrelevant; that the averments by inducement, innuendo and colloquia in the petition were insufficient to admit this character of evidence, and that it was not admissible as against the defendant insurance company, and against the defendant Jalonick, only so far as he had occasioned the publication. and that it was too general; which objections were sustained to the evidence and answers to the foregoing questions, and were excluded by the court, to which ruling of the court plaintiff then and there excepted, and now here tenders this his bill of exceptions to said ruling, and asks that the same be allowed and signed by the court."

There was error in excluding the testimony. When this case was before this court on a former appeal—the lower court having sustained a general demurrer to the petition—we held that the petition was sufficient to admit proof tending to show that plaintiff was the person charged with keeping a "Blind Tiger" in the pamphlet published, and that, the

libelous publication not charging plaintiff in person as keeping a "Blind Tiger," it could be made to apply to him by innuendo averments, under which the fact could be proved by legitimate testimony. It seems that on the last trial the court below did not so construe the holding of this court, as otherwise the testimony excluded as shown in the foregoing bill of exceptions would have been admitted—at least the most of it.

The cases extensively quoted from in the former opinion of this court sustain the conclusion that the application of the libelous matter can be applied to the plaintiff by innuendo. Especially did we think before, and we still think, that, as our statute only requires the petition in any case to consist only of "a statement in logical and legal form of the facts constituting plaintiff's cause of action," in a suit for libel it would be sufficient by innuendo to identify plaintiff as the person intended by the libelous charge. The publication charged some person with keeping a "Blind Tiger" in the house owned by plaintiff, and the colloquium, averment and innuendo clearly state that it was meant to charge plaintiff with the offense. It can not be doubted that the inquiry instituted by the petition is to ascertain if the plaintiff be the person meant by the libelous charge. Under our system of pleading it will be sufficient if the petition clearly shows that plaintiff was the person meant as keeping a "Blind Tiger," whether this be done in technical form of colloquium, innuendo or averment, or by all, as it was in this case.

The petition alleges that defendants "did falsely and unlawfully, on or about the 30th day of June, 1892, in the county of Hays aforesaid, print, publish, utter and circulate in a certain pamphlet   *   *   *   of and concerning plaintiff the following false, slanderous and defamatory words, to-wit." Then follows the libel, with innuendoes, after which there is an averment, "Meaning thereby and charging plaintiff with the immoral and criminal offense of keeping a place in which intoxicating liquors were sold by device, whereby he, plaintiff, delivering the same, was concealed from persons buying, and to whom the same was delivered, in his one-story building, block No. 13, on the south side Court House Square in San Marcos, Texas, where the sale of intoxicating liquors was prohibited by the laws of the State, which defendants then and there well knew was false, slanderous and untrue concerning plaintiff, whereby," etc.

The colloquium as alleged, that the words were printed and published "of and concerning plaintiff," together with the innuendo and the averment, following the libelous matter, was a sufficient statement that plaintiff was the person meant and that it was intended to charge him with the criminal offense named. If it be conceded that an innuendo in pleading can not supply the place of colloquium, or that the office of the innuendo is to explain and not to extend the meaning of the words in the libel (which seems to be the correct rule in common law pleading), we think it can not be said in this case that there is not colloquium and

averment sufficient to identify the plaintiff as the person meant by the libelous words and sufficient to charge him with a criminal offense. Nichols v. Packard 16 Vt., 83; Burtch v. Nickerson, 17 Johns., 216, and 8 Wend., 232, cited in last case.

These cases are in point, as are the cases quoted from in the opinion of this court on former appeal.

But it is believed that under our statute the petition will be sufficient if it clearly show that plaintiff is the person meant by the libelous words and it was intended to charge him with an offense under the law, whether such meaning appear in one part of the petition or another; and we think the petition is sufficient in this respect.

We conclude that the petition was sufficient to authorize the admission of legitimate testimony in libel.

The plaintiff may call his friends or those acquainted with the circumstances to state that on reading the libel they concluded it was aimed at the plaintiff. What readers of the libel understood with reference to it, who was meant and what was meant, would be proper testimony, in case the language is ambiguous, and from such testimony and the surrounding circumstances the jury are at liberty to form their conclusion. 2 Starkie on Slander 46-51; 13 Am. and Eng. Ency. of Law, text, and authorities cited in note 2, p. 393; 2 Greenl., Ev., sec. 417; Wimer v. Allbaugh, 42 N. W. Rep., 587; Zeliff v. Jennings, 61 Texas, 464.

There is a conflict of authority as to the admissibility of testimony of persons acquainted with the circumstances that they, from reading the libelous language, applied it to the plaintiff, but the weight of authority is that such testimony is admissible, and we think such testimony should be admitted.

Mr. Greenleaf says: "From the nature of the case they must be permitted, to some extent, to state their conclusion and belief, leaving the grounds of it to be inquired into on a cross-examination. If the words are ambiguous, and the hearers understand them in an actionable sense, it is sufficient, for it is this which caused the damage." 2 Greenl., Ev., sec. 417.

The rule as stated by Mr. Greenleaf is, in our opinion, correct, and we adopt it as stated.

What was meant by keeping a "Blind Tiger" was also subject of proof by persons who could testify to the meaning.

So it follows that most of the testimony excluded by the court was admissible. A witness could not state what the understanding of others was as to who and what was meant. A witness could state that the matter became notorious in the community that plaintiff was so charged. What other persons than the witness understood was meant must be shown by their own testimony. The testimony showing injury to plaintiff's character and standing in the community caused by the publication was also admissible.

If the court had admitted the testimony excluded, or the admissible part of it, doubtless his charge would have been different. Having ex-

cluded the testimony which would have shown to whom the publication applied and the meaning of it and its consequences to plaintiff, there was but little left to base a charge upon in favor of plaintiff. When, on another trial, the testimony is admitted, a proper charge of the law applicable to the facts will be suggested to the court.

The judgment of the lower court is reversed and the cause remanded.

*Reversed and remanded.*