CHAPA v. ABERNETHY. (No. 5439.)†

(Court of Civil Appeals of Texas. San Antonio. March 17, 1915. Rehearing Denied April 14, 1915.)

1. LIBEL AND SLANDER ☞21—APPLICATION OF WORDS TO PLAINTIFF—NAME.

A newspaper article, which charged that those who arrested one accused of murder lynched him and deserved to be executed, was a libel against one who was known in the community to be a member of the posse that attempted to make the arrest, and who himself killed the accused, though no name was mentioned.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. § 103; Dec. Dig. ☞21.]

2. LIBEL AND SLANDER ☞105—ADMISSIBILITY OF EVIDENCE—APPLICATION TO PLAINTIFF.

Plaintiff, in a libel suit, may call as witnesses those acquainted with the circumstances to state that, on reading the libel, they concluded that it was aimed at plaintiff.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. §§ 282, 283, 292–294; Dec. Dig. ☞105.]

3. LIBEL AND SLANDER ☞100—EVIDENCE—LIBELOUS ARTICLE.

Where a libelous article was made a part of a petition which was sworn to by plaintiff and not denied by defendant, it was not necessary to introduce the article in evidence.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. §§ 246–256, 258–272, 291, 322, 323; Dec. Dig. ☞100.]

4. LIBEL AND SLANDER ☞7—LIBEL PER SE—CHARGE OF MURDER.

An article wrongfully charging the commission of a capital crime is libelous per se.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. §§ 17–78; Dec. Dig. ☞7.]

5. LIBEL AND SLANDER ☞123—NECESSITY OF PROOF—DAMAGE.

Where an article is in evidence and is libelous per se, the court cannot direct a verdict for defendant for failure to prove damage, since the law presumes general damage from the publication of a libel.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. §§ 356–364; Dec. Dig. ☞123.]

6. LIBEL AND SLANDER ☞121—DAMAGE—EXCESSIVE DAMAGES.

In an action for the publication of a libel in a newspaper of limited circulation, where the only witness for plaintiff who testified to having read the article stated that it did not injure the standing or reputation of plaintiff, a verdict for $3,250 was excessive and should be reduced to $1,500, notwithstanding a sworn allegation of damage in the petition.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. §§ 353, 354; Dec. Dig. ☞121.]

Appeal from District Court, Atascosa County; F. G. Chambliss, Judge.

Action for libel by W. M. Abernethy against F. A. Chapa. Judgment for plaintiff, and defendant appeals. Affirmed on condition that plaintiff file a remittitur of part of the judgment; otherwise reversed and remanded.

Chambers, Watson & Reyes, of San Antonio, for appellant. W. W. Walling, Ed. Haltom, and C. C. Clamp, all of San Antonio, for appellee.

CARL, J. Appellee sued appellant to recover damages by reason of the publication and circulation of a certain article by appellant in a newspaper owned by him and printed in the Spanish language. The paper is called "El Emparcial de Texas," and was circulated in Bexar, Atascosa, and other counties, one copy of which the evidence shows was sent to James A. Walton, of Atascosa county, through the United States mail, and Walton read the article, thought it referred to appellee, and handed the paper to him. The article complained of, as translated, is as follows:

---

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

† Writ of error pending in Supreme Court.

"The Assassination of Trevino.

"A Deserving Attitude of the Mexicans of Jourdanton.

"On the 12th instant at 5:30 p. m. Elogio Trevino killed Sheriff Madlock, who urged Trevino to deliver to him a weapon he carried with him. There was a discussion between both, and as a consequence of this Trevino fired four shots at the officer, causing death. The killer fled, being chased by' an army of savages, who, after having him in their power, killed him in a most cowardly manner, they applied the lynch law to him.

"The Mexicans of that place, indignant at the savage crime, at once began to investigate the matter and named Lawyer Geo. M. Martin, whose uprightness is widely known to all the inhabitants of the county, as their representative.

"Mr. Marciano Ramirez, who is one of those who has shown the most activity in this case, delivered to lawyer Martin $500.00 for his fee to prosecute the criminals, among whom are found some very well-known persons of Jourdanton.

"On Monday, Mr. Ramirez, Lawyer Martin and D. Pablo Solis were in the city and held a long conference with our director at the offices of 'Emparcial de Texas,' in regard to this scandalous matter. They agreed to proceed thereupon against the guilty ones and to demonstrate that the shots which caused the death of Trevino were fired at such close range as to burn his clothes. His corpse will be exhumed next Saturday. For this purpose, Dr. E. Elmendorf and a competent embalmer will leave this city.

"It is dreadful the number of crimes of this nature which have been committed in Texas, and we do not know why, up to now, justice has been mocked so many times when a similar crime has been committed.

"Radicalism is necessary on some occasions and while after a lynching the authors have not been executed the infamous drama will continue, being represented among imbecile drunkenness and among the frenzied outcries of the red Hottentots, a disgrace to this nation and to this century."

The petition alleges that by "Sheriff Madlock" was meant Deputy Sheriff Matlock, and by "Elogio Trevino" was meant Eugenio Trevino; that by the expression: "Trevino fired four shots at the officer, causing death. The killer fled, chased by an army of savages"— defendant meant and intended to mean that said Trevino had fled after killing said Matlock, and that he was pursued by an army of savages, and that plaintiff was a savage, as well as were the other members of the posse; that by the expression, "After having him in their power, killed him in a most cowardly manner, they applied the lynch law to him," was meant, and the defendant intended it to mean and to be understood by those who read the article, that the posse, of which plaintiff was one, had taken Trevino into their possession and power; that, instead of protecting him and delivering him over to lawful authority, they murdered him in a most cowardly manner by lynching the said Trevino, or by executing him without a trial by legal authority, and that thereby the plaintiff and the other members of the posse were guilty of murder; that by the expression, "Mr. Marciano Ramirez, who is one of those who has shown the most activity in this case, delivered to lawyer Martin $500.00 for his fee to prosecute the criminals [meaning plaintiff and the others composing said posse]" and by the expression, "Among whom are found some very well-known persons of Jourdanton," was meant, and it was intended to mean, that plaintiff and the members of the posse were well-known persons of Jourdanton, so there would be no doubt in the minds of the readers that plaintiff and the other members of the posse were the criminals referred to. And it is alleged that said article meant, and was intended to mean, that plaintiff and other members of the posse were criminals because of the alleged fact that they had murdered Trevino while a prisoner in their power and should be put to death for such crime; that plaintiff and said posse were engaged in lynching, and, unless they were put to death, other lynchings would follow.

The plaintiff also alleged that he witnessed the killing of Deputy Sheriff Matlock by said Trevino, and that he and other citizens formed a posse and pursued Trevino for the purpose of arresting him, and, when they came upon him, said Trevino rose from behind a cord of wood and said in Spanish, but which in English meant: "I have two pistols. Beware, I will kill you"—and thereupon fired at plaintiff, who, in self-defense, returned the fire and killed Trevino, while attempting a lawful arrest of the deceased.

The good standing and high character of plaintiff was pleaded, and also the falsity of the article.

The cause was submitted to a jury on special issues as follows:

Question No. 1: "Is plaintiff, W. M. Abernethy, a party referred to in the alleged libelous article?" to which the jury answered, "Yes."

Question No. 2: "Was the article a privileged one?" to which the jury answered, "No."

Question No. 3: "What sum in money will be a reasonable compensation to the plaintiff for the damages sustained by him, if any, in this case?" to which the jury replied, "$3,250."

On the findings, the court entered judgment in favor of appellee for the sum found by the jury, and Chapa has appealed.

[1] Because of the fact that no names of those who took part in the attempted arrest and killing of Trevino are mentioned in the alleged libelous article, and because the same was printed in Spanish and only shown to have been read by James A. Walton, it is contended by appellant that no particular person was intended, and that a fair and reasonable deduction from the language used does not show by innuendo a reference to the appellee. And the whole case, as here presented, may be summed up as being a contention that a general demurrer should have been sustained, and that the verdict and judgment are contrary to the law and the evidence.

The article in question plainly does charge that those who took part in the attempted apprehension and resulting death of Trevino were guilty of lynching, a sometimes mode

of execution without trial or warrant of law—in short, murder by mob. It says they should be tried and executed, which is the same thing as saying that they are criminals who deserve the severest penalty known to our law. That appellee was not named therein would make no difference, for if those conversant with the facts and circumstances of the death of Trevino would, by reading said article, know to whom it referred, would know that appellee was one of the posse, and the statements were not true, it was a libel in law. The rule was well stated by Justice Collard in Houston Printing Co. v. Moulden, 15 Tex. Civ. App. 574, 41 S. W. 381:

"It was not necessary, to make the article published libelous, that plaintiff should have been named, if he was pointed out by circumstances. * * * It is only necessary that the words refer to some person ascertainable from the words used."

Also in the case of Express Pub. Co. v. Orsborn, 151 S. W. 575:

"It was not necessary that all the world should understand who the person defamed was. It is sufficient if those who know the plaintiff can discern that she was the person meant. Newell on Slander and Libel, p. 767."

The plaintiff below pleaded and proved that he was a member of the posse that gave pursuit to Trevino, and, upon overtaking him, returned the fugitive's fire and killed him in self-defense. Walton knew to whom the article referred as soon as he read it and took it to Abernethy, because he knew, as every one in that community must have known, that appellee was a member of the posse. So it will be seen that the article charged appellee with murder. It is not necessary at all for the words themselves to name the party charged; it being only necessary that the person be ascertainable from the language used.

[2] And for that purpose:

"The rule of evidence is that the plaintiff, in a libel or slander suit, may call as witnesses his friends or those acquainted with the circumstances to state, on reading the libel, they at once concluded that it was aimed at the plaintiff." Houston Printing Co. v. Moulden, 15 Tex. Civ. App. 574, 41 S. W. 381, citing 13 Am. & Eng. Ency. of Law, 393, and Schulze v. Jalonick, 14 Tex. Civ. App. 656, 38 S. W. 264.

To the same effect was the holding of this court, speaking through Mr. Justice Fly, in Express Pub. Co. v. Orsborn, 151 S. W. 575, in the language above quoted in this opinion.

It was not disputed that plaintiff was one of the posse that killed Trevino, nor that he in person did the killing. At the same time it is uncontradicted that he did it in self-defense. It is admitted that appellant owns "El Emparcial de Texas," and that copies of the paper containing the article were circulated in Bexar and Atascosa counties, nor is there any doubt that appellee was one of the parties referred to substantially as a murderer, savage, and "red Hottentot," who should be tried and executed for a capital crime.

[3] The article was not introduced in evidence, but was incorporated in the petition which was sworn to and not denied by appellant. It was agreed that the translation was correct, and this fact, coupled with the fact that this part of the petition was not denied, made it totally unnecessary to introduce the article in evidence.

[4] The court did not err in charging the jury that the article was libelous per se, for an article which wrongfully charges a commission of a capital crime is in itself libelous.

[5] The court did not err in refusing to sustain the general demurrer, nor is the verdict contrary to the law and the evidence. The article was in evidence, and it was libelous per se.

"It is the duty of the jury, acting under the instructions of the court, to carefully consider the whole of the defamatory words complained of and in evidence, and give such damages as in their opinion will fairly compensate the plaintiff for the injury done to his reputation." Newell on Slander and Libel (2d Ed.) § 13, p. 847.

And the same author says (page 838, § 1) that:

"General damages are those which the law will presume to be the natural or probable consequence of the defamatory words; they arise by inference of law and need not be proved by evidence. Such damages may be recovered wherever the immediate tendency of the words is to impair the party's reputation, although no actual pecuniary loss has in fact resulted."

[6] On account of failure to comply with the rules of briefing, we will not consider any of the other assignments, except the fourteenth, which complains that the verdict is excessive. The evidence shows that the article was in Spanish, and that copies were sent to somewhere between 30 and 50 subscribers in Atascosa county. The plaintiff did not testify, and the only witness who does testify is that he read the article is James A. Walton. He says it did not injure the plaintiff in his estimation, nor did it subject him to public contempt, hatred, and disgrace, in so far as he knew, and that he stands as well in the community now as he did before said article appeared. In view of all the facts and circumstances in this case, and the positive testimony of Walton, that the article did not injure plaintiff, we think it inconceivable that plaintiff could have been injured to the extent of $3,250 found by the jury, and we are not willing to permit a mere sworn pleading, although not denied as provided by law, to override direct testimony that it did not injure plaintiff, especially when this direct testimony comes from plaintiff's own witness. We are forced to the conclusion that the size of the verdict must be the result of prejudice or passion.

If within 20 days appellee files in this court a remittitur of $1,750, the judgment will be affirmed for the sum of $1,500, otherwise the judgment will be reversed, and the cause remanded for trial.