## ROY CRANE v. STATE.

No. A-2722.    Opinion Filed August 27, 1917.

(166 Pac. 1110.)

1.    **LIBEL AND SLANDER—Libel Against Class of Individuals.** The law of libel forbids the writing, publication, or circulation of libelous matter against a class as much so as against individuals.

2.    **SAME.** In order to render one amenable to prosecution for publishing or circulating libelous matter, it is not necessary that such matter name the individuals or any one of them composing the class against whom the matter complained of is libelous.

3.    **SAME—Information—Sufficiency.** For an information held sufficient to charge libel against the members of the Knights of Columbus living in Canadian county, see opinion.

*Error from County Court, Canadian County;*
*R. B. Forrest, Judge.*

Roy Crane was convicted of libel, and brings error. Affirmed.

*A. Turner,* for plaintiff in error.

*R. McMillan,* Asst. Atty. Gen., and *Fogg & Bennett,* for the State.

ARMSTRONG, J. The plaintiff in error, Roy Crane, was convicted at the January, 1916, term of the county court of Canadian county on a charge of libel. The information in the case, omitting the formal parts, is as follows:

"Now comes S. T. Roberson, county attorney of Canadian county, State of Oklahoma, who prosecutes on behalf of the state, and gives the court to know and be informed that one Roy Crane, late of the county of Canadian and State of Oklahoma, on or about the 4th day of July in the year of our Lord 1915, at and within said county and state, did then and there unlawfully, willfully, and maliciously circulate a certain printed book, entitled 'Barbarous Catholicism and Moral Theology of St. Liguori, by Prof. Roy Crane,' which printed book aforesaid contained certain false printed statements and matters of and concerning members of fourth degree Knights of Columbus, in that said printed statements and matters set out and stated, a purported part of the purported oath of said fourth degree Knights of Columbus, which said purported part of said purported oath was false and untrue; said Knights of Columbus being a Catholic fraternal lodge or association, members of which fourth degree Knights of Columbus, to wit, J. M. Harkin, W. E. Ross, T. H. Rasp, Dr. J. T. Riley, Rev. R. Sevens, A. J. Gerrer, and G. W. Flanigan, were on said date and are at this time residents of Canadian county, Okla., and which said false printed part of purported oath and statements and matter so circulated by the said Roy Crane, by the delivery and distribution of copies of said book to each of the following persons, to wit: G. F. Gossett, Joe Hainey, Ed Washecheck, Albert Edmenton, Fred Kimble, Rev. De Pew, Ernest Louchen, Guy Yowell, and Dave Taylor and others whose names are to the county attorney unknown—exposed the aforesaid fourth degree Knights of Columbus to public hatred, contempt,

ridicule, and obloquy, and which said false printed purported part of purported oath and statements and matter tended to deprive said fourth degree Knights of Columbus of public confidence, and which false printed purported part of purported oath, and statements and matter in said book so circulated by said Roy Crane as aforesaid is printed upon pages numbered 3, 4, 5, 6, and 7, in said book circulated as aforesaid, and is as follows, to wit:

" 'INTRODUCTION.

" 'Why I have written this book. During the last twenty-five years many of the devout and cultured protestants throughout the world have doubted that the intentions of the Roman Catholic religion was for the best interest of society, and in all times when they would read books put forth discussing the murderous, treasonable, dago philosophy called Catholicism, they would say, can this be true?

" 'But as the books they would read were either written by one who did not know or who was afraid to bind himself to write the truth under affidavit, and many, many are the times that well intending protestants would have liked to give good reasons for being opposed to Roman Catholicism, but as they had nothing that they knew to be absolutely true against the Roman Catholic religion they would not discuss the question.

" 'It is in behalf of these classes of American Citizens that I give unto them and the world the greatest treatise of the subject of Roman Catholicism since the days of Martin Luther.

" 'And every word in this book is given under a sworn affidavit and of itself establishes beyond a reasonable doubt that the book's contents is true and correct, for if it were not the author would be sent to the penitentiary.

" 'Not only will you find a complete and correct record of the Massacre of Odessa, Russia, but you will also find a translation of the moral theology of Saint Liguori, which is the prescribed moral standard of the Catholic

Church and unto it every Priest is bound to be subject and the same questions that the Priest ask women and children in the confessional box are herein contained and given to you subject to your own honest and sincere consideration.

" 'This book also makes plain that the blessings and curses of the Pope of Rome accomplish nothing according to the statements given, not only does this book give unto you the spirit of the Catholic Church of the whole world and a record of the Pope's blessings and curses, but it also gives to you the effect of this immoral culture wherever Rome has become supreme and those who have doubted as to what Roman Catholicism is and when its doctrines were originated, will find in this book the standard doctrines of the church of Rome and correct statements as to when and from where they obtained their ideas and a record of the immoral lives of the different Catholic Popes of Rome is made plain to you as to what they did and as to the times they did it.

" 'With all doubt as to the truthfulness of this book removed, because of the affidavit affixed you can refer to it as being true and correct and by and with its help and aid, you are enabled if opportunity presents, to refute every claim of Roman Catholicism being either Christian, American, civilized or respectable.

" 'Yours very truly, PROF. ROY CRANE.

" 'CHAPTER ONE.

" 'The Fourth Degree Oath.

" 'On February 15, 1913, there appeared on the record of the report of Congress an oath of the fourth degree Knights of Columbus, which was published by the "Menace" and a half dozen or more other Anti-Catholic papers published in the United States and the "Knights of Columbus" claimed said oath as published by the Menace and other Anti-Catholic papers was untrue, but as I have proof of the doctrine of said oath to be published in this book, and by undisputable evidence I shall prove that the doc-

2-14

trine of said oath was put in operation by the Catholic people, when they committed every crime indicated for them to commit in the Fourth Degree oath (as it appeared in the Menace).

"'For more than four years I have been lecturing against the Catholic Church, during this time I have debated with many of the most learned Catholic Priests of the United States and have always won the debate so completely that the Catholic press would not dare mention it to their fish fed dupes who maintain the holy "dads" who help souls out of purgatory, a place where the departed dead go according to the church, but in fact, it is a place located in that part of the Catholic head where there is no brains. If what I write in this book was not true, I would be sent to the State's Prison at McAlester and if what I write in this book is true the Catholics are moral degenerates who should be driven out of the United States of America as their doctrine is both un-Christian and un-American, and places in danger every man, woman and child's life who is not a Catholic; as in Odessa, Russia, they spared no Non-Catholics purposely.

" 'The Catholic Church has always been the same blood thirsty monster that it is today and I shall refer you to its doctrine and its teachings as evidence of its purpose as a world power; and as to its crimes I shall refer you to her history during the last 2,000 years, which would make the imps of hell blush with shame because of their heartless crimes and criminals. No dago shall ever be a god to me. And the rum soaked prayer peddler who receives his power from Heaven and buttons his collar behind to prove it, must either send me to the State's Prison for writing this book, but only a coward wants to live forever, and Roy Crane is not afraid to die, as it is written, "Greater Love has no man than this, that he would lay down his life for his friends."

"That part of the Fourth Degree oath that appeared to be most unbelievable, was printed in the "Menace" and is as follows:

" ' "I do further promise and declare that I will, when opportunity presents, make and wage relentless war, secretly and openly against all Heretics, Protestants and Liberals as I am directed to do, to extirpate from the face of the whole earth and that I will spare neither age, sex or condition, and that I will hang, burn, waste, boil, flay, strangle and bury alive these infamous heretics, rip up the stomachs and wombs of their women, and crush their infants' heads against the walls in order to annihilate their execrable race. That when the same cannot be done openly, I will secretly use the poison cup, the strangulation cord, the steel of the poinard or the leaden bullet, regardless of the honor, rank, dignity or authority of the person or persons, whatever may be their condition in life, public or private, as I at any time may be directed to do, by any agent of the Pope or Superior of the Brotherhood of the Holy Father of the Society of Jesus.

" ' "In confirmation of which I hereby dedicate my life, my soul, and all corporal powers, and with the dagger which I now receive, I will subscribe my name, written in my blood, in testimony thereof, and should I prove false or weaken in my determination, may my brethren and fellow soldiers of the Militia of the Pope cut off my hands and my feet and my throat from ear to ear, my belly opened and sulphur burned therein with all of the punishment that can be inflicted upon me on earth and my soul shall be tortured by demons in eternal hell forever.

" ' "All of which I, ........................, do swear by the blessed Trinity and Blessed Sacrament which I am now to receive, to perform and on my part to keep, this my oath.

" ' "In testimony whereof; I take this most holy and blessed sacrament of the Eucharist, and witness the same further with my name written with the point of the dagger, dipped in my blood or be looked upon by every honest citizen as an enemy of humanity and not a fit subject to run at large.

" ' "I know that the same class of murderers who killed William Black for telling the truth may kill me for

writing in my own blood, and seal, in the face of this holy Sacrament, (He receives the wafer from the Superior and writes his name with the point of his dagger dipped in his own blood taken from his heart.)"

" 'If the above oath does not make the blood of every true American boil with righteous indignation, he or she is surely lacking in all the elements of patriotism.

" 'I would not care about the oath of any body of men so long as their oath did not threaten human life and liberty, but as the Knights of Columbus denies this treasonable oath, I feel it my duty to prove it beyond a reasonable doubt, that every principle of this aforesaid oath was put in force in Odessa, Russia, where ninety per cent. of the people are Catholics and eighty per cent. cannot read or write, and as the Catholic Church claims to be the same all over the earth, then it is only reasonable to believe that what they do in one part of the earth when they have the power, that they would do the same in any other part of the earth if they but dared to do so, and what the Catholic Church does in one age of the world she would do now, on her own testimony she cannot change, *"et semper eadem"* that is: "she is always the same."

"And so he, the said Roy Crane, did then and there unlawfully, willfully, and maliciously, in the manner and form above set forth, commit the crime of libel, contrary to the form of the statute in such case made and provided, and against the peace and dignity of the state."

A demurrer was filed to the information, and by the court overruled. The demurrer is as follows:

"Comes now the defendant, Roy Crane, and demurs to the information filed herein for the reason that, taking all the facts alleged in said information to be true, it does not show that the defendant, Roy Crane, slandered or libeled any individual in Canadian county, State of Oklahoma, or any other portion of the State of Oklahoma, and does not show that the defendant has violated any of the

laws of the State of Oklahoma, and that this court is without jurisdiction to try this case. Wherefore, defendant asks that this case be dismissed."

The disposition of the question raised as to the validity of the information practically disposes of the case. There is no question about the guilt of the accused if the information is good.

It is urged by counsel that the court erred in overruling the demurrer and that this cause should be reversed for the reason that the information fails to show that the plaintiff in error, Roy Crane, mentioned the names of J. M. Harkin, W. E. Ross, T. J. Rasp, Dr. J. T. Riley, Rev. R. Sevens, A. J. Gerrer, and G. W. Flanigan in the articles published, and, further, on the ground that the said Roy Crane, in the book aforesaid, did not specifically refer to the organization known as the "Knights of Columbus" in Canadian county, Okla. The only authority cited by counsel for plaintiff in error is section 5751, Rev. Laws 1910, which is as follows:

"An indictment or information for libel need not set forth any extrinsic facts for the purpose of showing the application to the party libeled of the defamatory matter on which the indictment or information is founded, but it is sufficient to state generally that the same was published concerning him, and the fact that it was so published must be established on the trial."

The argument is without merit. The information sufficiently charges the crime of libel, as will be seen from the authorities quoted and cited below. Section 2380, Rev. Laws 1910, is as follows:

"Libel is a false or malicious unprivileged publication by writing, printing, picture, or effigy or other fixed representation to the eye, which exposes any person to public

hatred, contempt, ridicule or obloquy, or which tends to deprive him of public confidence, or to injure him in his occupation, or any malicious publication as aforesaid, designed to blacken or vilify the memory of one who is dead, and tending to scandalize his surviving relatives or friends."

In *State v. Brady*, 44 Kan. 435, 24 Pac. 948, 9 L. R. A. 606, 21 Am. St. Rep. 296, considering the principle here involved, the Supreme Court of Kansas said:

"The appellant again contends that the statement published referred to no particular one of the Harvey family as having been a prison convict. While this objection might be urged with some force in a civil suit for damages, we do not think it is good in a criminal prosecution for libel. The law is elementary that a libel need not be on a particular person, but may be upon a family, or a class of persons, if the tendency of the publication is to stir up riot and disorder, and incite to a breach of the peace. *Rex v. Williams*, 5 Barn. & Ald. 595; *Rex v. Osborn*, 2 Barnard, 166; *Anon, Id.* 138; 2 Bish. Crim. Law (7th Ed.) sec. 934; 2 Starkie, Slander & L. 213; Russ. Crimes (1st Amer. Ed.) 305, 332. A scandal published of three or four, or any one or two persons, is punishable at the complaint of one or more or all of them. Holt, Libel, 247. In *Palmer v. City of Concord*, 48 N. H. 211 [97 Am. Dec. 605] the Supreme Court said: 'As these charges were made against a body of men, without specifying individuals, it may be that no individual soldier could have maintained a private action therefor; but the question whether the publication might not afford ground for a public prosecution is entirely different. Civil suits for libel are maintainable only on the ground that the plaintiff has individually suffered damage. Indictments for libel are sustained principally because the publication of a libel tends to a breach of the peace, and thus to the disturbance of society at large. It is obvious that a libelous attack on a body of men, though no individuals be

pointed out, may tend as much·or more to create public disturbance as an attack on one individual; and a doubt has been suggested whether the fact of numbers does not add to the enormity of the act.'   2 McClain's Crim. Law, sec. 1044.

"The defendant claims there was error in the court's refusing the fourth special instruction asked—that, before the jury could convict, express malice must be proven.  We do not think this is the legal rule.   In prosecutions for libel, malice is inferred from the nature of the charge, and when the publishing of words libelous *per se* is once proved, malice is inferred, as a person is presumed to have intended the consequences of his own act.   Chief Justice Shaw has clearly stated the rule:   'It is not necessary, to render an act malicious, that the party be actuated by a feeling of hatred or ill will toward the individual, or that he entertain and pursue any general bad purpose or design. On the contrary, he may be actuated by a general good purpose, and have a real and sincere design to bring about a reformation of matters; but if in pursuing that design he willfully inflicts a wrong on others which is not warranted by law, such act is malicious.'   Newell, Defam. 317; *Commonwealth v. Snelling*, 15 Pick. [Mass.] 340; *Pledger v. State* [77 Ga. 242] 3 S. E. 320.   The want of actual intent to vilify is no excuse for a libel; and if a man deems that to be right which the law pronounces wrong, the mistake does not free him from guilt.   *Curtis v. Mussey*, 6 Gray [Mass.] 261; 1 Bish. Crim. Law, sec. 309; *Reynolds v. U. S.*, 98 U. S. 145 [25 L. Ed. 244]."

The same principle was considered by the Court of Criminal Appeals in the State of Texas in *Jones v. State*, 38 Tex. Cr. R. 364, 43 S. W. 78, 70 Am. St. Rep. 751.   In this latter case Jones was prosecuted and convicted for publishing certain libelous matters concerning street railway conductors of the Galveston City Railroad Company. No particular one was mentioned in the article.   The court, discussing the proposition on appeal, said:

"By reference to the libelous matter published, it will be seen that the first sentence in said publication refers to the conductors on the various street cars of this city [meaning the city of Galveston] as a class. The libelous matter makes no exceptions among the conductors, but includes all of them. This has been held sufficient, without designating the names; and we hold this to be sufficient designation of every conductor in the service of said railroad company at the time of said publication. It therefore would be a violation of our statute to libel any sect, company, or class of men without naming any person in particular who may belong to said class. See 13 Am. & Eng. Ency. of Law, 499, and notes; 2 McClain's Criminal Law, sec. 1044."

The issue in the case under consideration is identical in principle with that in the Jones Case. Here the injured parties belonged to the fourth degree Knights of Columbus, and the libelous matter applied to each member of that organization and excepted none. In the Jones Case the libelous matter applied to each member of the street railway conductors' organization and excepted none.

In *State v. Hosmer*, 72 Or. 57, 142 Pac. 581, Hosmer was prosecuted and convicted in the courts of Oregon of libel for publishing a pamphlet entitled, "The Escaped Nun from Mt. Angel Convent," or "The Last Stand of Desperate Despotism." The document purported to give a history of the alleged escape of Mary Lasenan from the convent at Mt. Angel, and, in addition, an account of commissions by priests of many acts of lawlessness. On appeal, the Supreme Court of Oregon discussed these propositions fully, and cited many authorities. We quote, with approval, the following:

"The argument proceeds upon the theory that the defendant could not be held responsible for a publication

of an article, however libelous, if the inspiration thereof
was from third parties, unless the defendant had made
some intimation of its truthfulness. The essence of the
crime of libel is the publication of libelous language, and
does not necessarily lie in the authorship of the article.
Every repetition of a false and scandalous matter origi-
nated by a third person is a willful publication of it, ren-
dering the person so repeating it amenable to the law. If
he repeats the libelous words, he must be prepared to
prove them, or suffer the legal consequences. An English
author thus states the law: 'Every repetition is a fresh
defamation, and the defendant by repeating the words has
made them his own and is legally as liable as if he had
invented the story himself.' Odgers, Libel and Slander,
172. And another author in treating of repetitions of
scandalous matter originated by others, says: 'Talebear-
ers are as bad as talemakers, and it is no defense that
the speaker did not originate the scandal, but heard it
from another, even though it was a current rumor, and he
in good faith believed it to be true. Nor is it any defense
that the speaker at the time, named the person from whom
he heard the scandal.' Newell on Defamation, p. 350. It
must be true that one who gives currency to a libel is
equally guilty with the perpetrator of the libelous charge;
otherwise 'scandalous reproaches and foul infamies' could
be uttered with autocratic impunity by placing between
the law and the iniquity of the act the presence of a third
person. As authority for our conclusions, we cite *Harris
v. Minvielle*, 48 La. Ann. 908, 19 South. 925; 25 Cyc. 574;
18 Am. & Eng. Ency. of Law (2d Ed.) p. 1056; Wharton's
Criminal Law (11th Ed.) vol. 3, sec. 975; *Funk v. Beverly*,
112 Ind. 190, 13 N. E. 573. * * * When a libel has
been committed, the state in its sovereign capacity seeks
to avenge the wrong, not because of the injury done to
the individual, but because the commission of the act tends
to affect injuriously the good order of society and the
dignity of the state. A single act or transaction in viola-
tion of the law may, as a general rule, be charged in one
count as a single offense, although the act involves several

similar violations of law with respect to several different-persons. 22 Cyc. 383. If the gist of the crime of libel was the injury to the reputation of the person libeled, counsel's argument would be unanswerable, and the indictment in mind would be duplicitous, but when we reflect that the perpetration of a libel is punishable because it tends to produce a breach of peace, then it will appear that the number libeled in the article is immaterial, and the libeler is punished for his own act of publishing a libel calculated to produce violence. *Tracy v. Commonwealth*, 87 Ky. 578, 9 S. W. 822; *State v. Hoskins*, 60 Minn. 168, 62 N. W. 270, 27 L. R. A. 412; 22 Cyc. 383; *Roberts v. State*, 51 Tex. Cr. R. 27, 100 S. W. 150. Our conclusion is that the indictment is not duplicitous and that the trial court acted with wisdom in overruling the defendant's motion to elect. * * * Defendant grieves at the court's action in advising the jury that 'to constitute a criminal libel it is not necessary that the publication should relate to a person. It can be committed by publishing scandalous matter about a corporation, and which has a direct tendency to injure it in its business.' The contention is made that a corporation cannot be libeled. Adverting to the statute, it will be observed that the word 'person' alone is used as a designating term of who might be libeled. However, it is not necessary to turn to the adjudicated cases to determine the meaning of the word, as it is defined by statute at section 2403, L. O. L.: 'The word "person" includes corporations as well as a natural person.' Obviously by the strength of the statute a private corporation, as well as an individual, is included in the word 'person,' and therefore is an object of libel. *State v. Herold*, 9 Kan. 194; *State v. Boogher*, 3 Mo. App. 442; *State v. Williams*, 74 Kan. 180, 85 Pac. 938; Wharton's Criminal Law (11th Ed.) vol. 3, sec. 923."

In *People v. Eastman*, 188 N. Y. 478, 81 N. E. 459, 11 Ann. Cas. 302, Eastman was prosecuted in the courts of New York for circulating obscene matter entitled, "The Open Door to Hell." The defendant demurred to

the indictment on the ground that it did not state a crime. The demurrer was sustained at the trial court and again at the Appellate Division. The state again appealed to the Court of Appeals. Cullen, C. J., discussing the proposition, said:

"* * * The charges in the article being against a whole class, no single individual could maintain an action for libel against its author (*Summer v. Buel,* 12 Johns. [N. Y.] 475), but not so, however, as regards a criminal prosecution for libel. The foundation of the theory on which libel is made a crime is that by provoking passions of persons libeled, it excites them to violence and a breach of the peace. Therefore a criminal prosecution can be sustained where no civil action would lie, as, for instance, in this very case, where the libel is against a class *(Summer v. Buel, supra; Palmer v. Concord,* 48 N. H. 211 [97 Am. Dec. 605]; *State v. Brady,* 44 Kan. 435, 24 Pac. 948 [9 L. R. A. 606, 21 Am. St. Rep. 296]), and also in the case of a libel against a deceased person. It may be urged that the question whether the defendant should be prosecuted for an indecent publication or for libel is a technical one. This is very far from being the fact. So careful have the people of the state been to secure freedom of speech, subject only to punishment when a jury has found that freedom has been abused, that by the various constitutions of this state, ever since that of 1822, it has been expressly enacted that in a prosecution for libel the truth may be given in evidence, and the jury shall have the right to determine the law as well as the fact. This applies to no other criminal prosecution."

In *People v. Turner,* 28 Cal. App. 766, 154 Pac. 34, Turner was prosecuted in the courts of California on a charge of libel growing out of printing in a newspaper a statement charging that members of the fourth degree Knights of Columbus took an oath containing, among other things, the following matter:

" 'I do now denounce and disown any allegiance as due to any heretical king, prince or state, named Protestant or Liberals, or obedience to any of their laws, magistrates or officers.

" 'I do further promise and declare that I have no opinion or will of my own or any mental reservation whatsoever, even as a corpse or cadaver (*perinde ac cadaver*), but will unhesitatingly obey each and every command that I may receive from my superiors in the militia of the Pope and of Jesus Christ.

" 'That I will in voting always vote for a Knight of Columbus in preference to a Protestant—especially a Mason—and that I will leave my party to do so; that if two Catholics are on the ticket I will satisfy myself which is the better supporter of Mother Church and vote accordingly.

" 'That I will not deal with or employ a Protestant if in my power to deal with or employ a Catholic. That I will place Catholic girls in Protestant families of the heretics.

" 'That I will provide myself with arms and ammunition that I may be in readiness when the word is passed, or I am commanded to defend the church as an individual or with the militia of the Pope.' "

Immediately following this purported oath, the following comment is added:

"To the quiet, law-abiding, liberty-loving, American citizen, it is almost unbelievable that any fellow citizen or body of them can seriously undertake or hope to overthrow our present form of government and replace it with an absolute monarchy. It is still more unbelievable that such a proposed monarchy should be dominated by a foreigner, and that such a change be brought about under the guise of religion. Yet, if such a citizen will but open his eyes to the condition existing under his very eyes, and open his ears to the open, avowed purpose of the Roman

Catholic Church, he will no longer rest easily 'in his present peaceful slumber."

The Supreme Court of California, reviewing and affirming the conviction, among other things, said:

"It would seem that a mere statment of the published oath, coupled with an averment that it was false and malicious, would be sufficient to bring the publication within the terms of section 248 of the Penal Code. It would be a severe reflection upon the condition of the law of libel if it permitted to go uncondemned the publication of articles such as this, if false. It is clear that the published oath, if believed by the community to be taken by the members of the fourth degree Knights of Columbus, would have a tendency to expose those persons to hatred, contempt, or ridicule. While the publication may not, as claimed by the defendant, directly impeach their honesty and integrity, it does in a most direct and vital way assail their loyalty as citizens by charging them with the taking of an obligation which is in itself a violation of their oath of allegiance and of the essential duties and bonds of American citizenship, and thus in a general sense impeaches their reputations, and exposes them to those attitudes of public feeling described in the section of the Penal Code. At the time of the publication of the article in question it appears from the record that there was a political campaign in progress in Santa Cruz county, where the article was published; and perhaps it is fair to infer from the record that some of the candidates for election were members of the fourth degree Knights of Columbus, but none of the prosecuting witnesses were such candidates. With the record in that condition defendant contends: First, that the publication was not of and concerning the prosecuting witnesses; and, secondly, that the alleged libelous matter applies to a class or generally to all of the members of the fourth degree in the fraternal order mentioned, and therefore has no individual application, and that for these reasons the judgment of conviction cannot

stand.    While the published matter may have been in-
tended to apply only to persons who were candidates for
office at that election, nevertheless, in terms and in effect,
it refers to each and every member of the order of the
degree named.    It is undisputed that the publication was
false, that the prosecuting witnesses were members of the
society of the degree in question, and the inevitable con-
clusion to be drawn from the article is that every member
of the order of the fourth degree had taken and subscribed
to the published oath.    The article asperses the character
of such members, and ascribes to them base and dishonest
motives, and as to them its publication constituted criminal
libel, whether at that time a candidate for public office or
not.    The points presented by defendant might be urged
with some force in a civil action in mitigation of damages,
but we do not believe they are good in a criminal prosecu-
tion for libel, for, as is said in the case of *State v. Brady,*
[44 Kan. 435, 437] 24 Pac. 948, 949 [9 L. R. A. 606, 21
Am. St. Rep. 296] : 'The law is elementary that the libel
need not be on a particular person, but may be upon a
family or a class of persons if the tendency of the publica-
tion is to stir up riot and disorder and incite to a breach
of the peace.    It is obvious that a libelous attack upon
a body of men, though no individual may be pointed out,
may tend as much or more to create a public disturbance
as an attack on one individual, and a doubt has been sug-
gested whether the "fact of numbers does not add to the
enormity of the act." '    This statement is a correct ex-
position of the law and of the causes of its existence.    *Peo-
ple v. Crespi,* 115 Cal. 50, 46 Pac. 863."

In further support of the sufficiency of this informa-
tion, see *State v. Dowd,* 39 Kan. 412, 18 Pac. 483; *State
v. Williams,* 74 Kan. 180, 85 Pac. 938; *State v. Elder,* 19
N. M. 393, 143 Pac. 482.

After a careful review of the authorities called to our
attention and those we have been able to find, there ap-

pears no question about the validity of the information in the case under consideration. It undoubtedly states facts sufficient to constitute a public offense, and is not objectionable upon the grounds urged or any others.

The proof offered on behalf of the state fully supports the allegations in the information, to the effect that Crane published and distributed a book containing the libelous matter set forth in said information. Numerous witnesses testified to the falsity of the scurrilous charges contained in the book. Many members of the Knights of Columbus residing in Canadian county offered in testimony the correct oath taken by the fourth degree Knights of Columbus. The court excluded this on the ground that it was not necessary to disclose the true oath of this order, but that it was sufficient to show that the purported oath was false, and was not the one taken by the members of that order. These witnesses testified that no part of the alleged oath set forth in the information was subscribed to by the members of the fourth degree Knights of Columbus, and no part of same was taken by them; and, further, that all those named in the information were members of the order and residing in Canadian county at the time Crane's book was circulated in that jurisdiction. There was no proof offered contradictory to the facts testified to by witnesses on behalf of the state. Crane himself, although publishing a sworn statement that the matters set forth in his book were true and holding himself out as the author of a document of unimpeachable verity, testified to no facts in support of his statements, and clearly discloses by his own offer of testimony that his published statements on these propositions were based on hearsay of unworthy origin.

It is to be regretted that the statute does not prescribe imprisonment in the penitentiary as the punishment for this class of crime in order that such a character as this record discloses plaintiff in error to be should receive the judgment which this author in this book says would be proper if his statements are untrue. That they are untrue and false *in toto,* the proof offered in this case overwhelmingly establishes. The writing, publication, and distribution of a book or document containing the matter complained of is libelous *per se,* and there is no contention made in the brief of counsel for plaintiff in error to the contrary.

It is remarkable that in this country, where freedom of conscience in religious matters was one of the chief basic doctrines upon which the government was founded, people who hold themselves forth as possessing even ordinary intelligence would indulge in this character of criminal conduct. There are few, if any, intelligent people who can be duped by that class of writers who indulge in these vilifications and misrepresentations of those who happen to disagree with them in church or fraternal matters.

The fundamental law of both the state and the nation guarantees to each individual the right to associate himself with any religious creed of his own selection, and no person of any other faith has the right to interfere with or publish false statements against the individual or the organization, or its lawful mode or method of religious worship. Law-abiding citizens and law-supporting organizations—church or otherwise—are not given to the practices set forth in the libelous document complained of in this information. The purported oath set forth as that of the fourth degree Knights of Columbus would be a discredit to the most ultraanarchistic organization permitted

to exist. The charge that members of an honorable organization, secret, religious, or otherwise, subscribe to such an oath as that complained of or the doctrines alleged is not tolerable, and is not permitted by the law. The statute was intended to suppress criminality of this character, and its provisions are ample to punish those who have no more respect for themselves, society, or law than to indulge in this unwarranted and illicit business. The law is intended to, and does, protect the self-respecting, lawabiding citizen against these calumnies, whether made against an individual specifically, or a class of individuals collectively..

The plaintiff in error was properly convicted by the jury. There were no errors of law committed by the court which resulted in prejudice to the · rights of the plaintiff in error. It follows, therefore, that the judgment of conviction should be affirmed.

Affirmed.

DOYLE, P. J., and MATSON, J., concur.