[Crim. No. 1117. First Appellate District, Division One.—September 5, 1923.]

## THE PEOPLE, Respondent, v. DAVID J. GORDAN, Appellant.

[1] CRIMINAL LAW—LIBEL—MALICE—EVIDENCE.—In a prosecution for libel under an information alleging in substance that the defendant, as the owner of a magazine, published therein a certain false and malicious libel concerning the members of the fourth degree of the Knights of Columbus, and of and concerning a named individual, a member of that organization, the evidence sufficiently established malice, where it was shown that defendant published the article knowing it to be untrue and without justifiable ends, and for the sole purpose of injuring the members of that society by discrediting their honesty, integrity, and reputation, and with a desire to expose them, and said individual as a member thereof, to public hatred, contempt, or ridicule, and that the so-called oath of the society published in the article was false, and that neither said individual nor any other member of the fourth or any other degree of the order ever took such an oath, the defendant making no attempt to refute such evidence or to prove that such an oath was taken.

[2] ID.—SECTION 254, PENAL CODE—CONSTRUCTION.—Section 254 of the Penal Code, which provides in substance that no reporter, editor, or proprietor of any newspaper is liable to prosecution for a fair and true report of any judicial, legislative, or other public official proceedings except upon proof of malice in making such report, and that malice is not to be implied from the mere fact of publication, does not afford immunity to one who has willfully and maliciously distorted a statement found in a legislative publication by intentionally publishing fragmentary and incomplete parts thereof which do not indicate a fair summary of the whole proceedings.

[3] ID.—PLEADING — INNUENDO — SUFFICIENCY OF INFORMATION. — In such prosecution the contention that no public offense is alleged against defendant because the information does not by direct allegation or by innuendo charge that defendant intended to have it understood that the members of the fourth degree ever administered or took the oath cannot be sustained where the information expressly alleged that the defendant did willfully and maliciously print and publish a certain false and malicious libel and defamation of and concerning the members of the fourth

2. Character of libel or slander for which prosecution will lie, note, 19 A. L. R. 1470.

degree of the Knights of Columbus and of and concerning a named individual.

[4] Id. — Innuendo — Office of. — When the words in their plain natural meaning are actionable *per se* no innuendo is required; the office of the innuendo is to point out and to refer to matters already expressed; to explain the meaning of the publication when it is obscure, and to designate the persons alleged to have been libeled when they are alluded to in covert and ambiguous terms.

[5] Id.— Pleading — Libel Against Class — Naming of Individuals Unnecessary.—In *order to render one amenable to prosecution for publishing or circulating libelous matter it is not necessary that such matter name the individuals or any of them composing the class against whom the matter complained of is published.*

APPEAL from a judgment of the Superior Court of the City and County of San Francisco. J. E. Woolley, Judge Presiding. Affirmed.

The facts are stated in the opinion of the court.

Sawyer & Sawyer for Appellant.

U. S. Webb, Attorney-General, John H. Riordan, Deputy Attorney-General, and Robert L. McWilliams for Respondent.

TYLER, P. J.—Defendant was charged by information with violating the provisions of section 249 of the Penal Code. That section defines and prohibits the offense commonly known as criminal libel. He was tried by a jury, found guilty, and sentenced to imprisonment in the county jail for the term of six months. This is an appeal from the judgment of conviction and the order denying defendant's motion for a new trial.

Defendant is the owner and publisher of a magazine styled "The Crusader," and it has a circulation of some

<hr/>

4. Innuendo in prosecution for libel or slander, notes, 31 L. R. A. (N. S.) 140; 50 L. R. A. (N. S.) 1043.

5. Right of one not specially named to maintain action for libel or slander based on charges made against a class or group of persons to which he belongs, notes, 8 Ann. Cas. 135; 14 Ann. Cas. 329; Ann. Cas. 1915C, 352; 23 L. R. A. (N. S.) 726; 25 L. R. A. (N. S.) 382; 42 L. R. A. (N. S.) 870.

sixty to eighty thousand copies. The information alleges in substance that defendant, as such owner, published in his magazine a certain false and malicious libel concerning the members of the fourth degree of the Knights of Columbus, and of and concerning one David Supple, a member of that organization. The article was published under the heading "The K. K. K. Oath Versus the K. C. Oath," and is in the following terms:

"As Klansmen we have no fight with anyone that has this country's interest at heart. We prefer to live in harmony with all men and would work with them to keep this country the greatest, grandest and the most wonderful country in the world, where every man can work his way up the ladder of success and live a life of complete happiness and harmony, always remembering those sublime words, 'Peace on earth, good will to all men.'

"Perhaps you will be interested in the Ku Klux Klan oath, or the first part thereof:

"Oath of Allegiance.

" '(You will say) I —— (pronounce your full name and repeat after me) most solemnly pledge, promise and swear that I will never slander, defraud or in any manner wrong the Knights of the Ku Klux Klan, a Klansman or a Klansman's family, nor will I suffer the same to be done if I can prevent it.

" 'I swear that I will be faithful in defending and protecting the home, reputation and physical and business interests of a Klansman and that of a Klansman's family.

" 'I swear that I will at any time without hesitating go to the assistance or rescue of a Klansman in any way, at his call I will answer, I will be truly Klanish towards Klansmen in all things honorable.

" 'I swear to keep secure to myself a secret of a Klansman when same is committed to me in the sacred bond of Klansmanship, the crime of violating this solemn oath, treason against the United States of America, rape and malicious murder excepted.

" 'I most solemnly assert and affirm that to the Government of the United States of America and any state thereof of which I may become a resident I sacredly swear an unqualified allegiance above every and any kind of govern-

ment in the world. I here and now pledge my life, my property, my vote and my sacred honor to uphold its flag, its constitution and constitutional laws, and will protect, defend and will enforce same until death.

"'I swear that I will most zealously and valiantly shield and preserve by any and all justifiable means and methods the sacred constitutional rights and privileges of free public schools, free speech, free press, separation of church and state, liberty, white supremacy, just laws, and a pursuit of happiness, against any encroachment of any nature by any person or persons, political party or parties, religious sect or people, native, naturalized or foreign, of any race, color, creed, lineage or tongue whatsoever.

"'All to which I have sworn by this oath, I will seal with my blood, be Thou my witness, Almighty God. Amen.'

"Knights of Columbus Oath, Fourth Degree.

"'I, . . . . . . . . now in the presence of Almighty God, the blessed Apostle St. Peter and St. Paul, and all the saints, sacred host of heaven, and to you, my Ghostly Father, the Superior general of the Society of Jesus, founded by St. Ignatius Loyola, in the pontification of Paul the III, and continued to the present, do by the womb of the Virgin, the matrix of God and the rod of Jesus Christ, declare and swear that his Holiness the Pope is Christ's vice-regent and is the true and only head of the Catholic or Universal Church throughout the earth; and that by virtue of the keys of binding and loosing given His Holiness by my Saviour, Jesus Christ, he hath power to depose heretical kings, princes, States, Commonwealths and Government, and they may be safely destroyed. Therefore to the utmost of my power I will defend this doctrine and his Holiness' right and custom against all usurpers of the heretical or Protestant authority whatever, especially the Lutheran Church of Germany, Holland, Denmark, Sweden and Norway, and the now pretended authority and Churches of England and Scotland and the branches of same now established in Ireland and on the continent of America and elsewhere, and all adherents in regard that they may be usurped and heretical opposing the Sacred Mother Church of Rome.

" 'I do now denounce and disown any allegiance as due to any heretical king, prince or state, named Protestant or Liberals, or obedience to any of their laws, magistrates or officers.

" 'I do further declare that the doctrine of the Churches of England and Scotland, of the Calvinists, Huguenots, and others of the name of Protestants or Masons to be damnable, and they themselves to be damned who will not forsake the same.

" 'I do further declare that I will help, assist and advise all or any of His Holiness' agents in any place where I should be, in Switzerland, Germany, Holland, Ireland or America, or in any other kingdom or territory I shall come to, and do my utmost to extirpate the heretical Protestant or Masonic doctrines and to destroy all their pretended powers, legal or otherwise.

" 'I do further promise and declare that, notwithstanding that I am dispensed with to assume any religion heretical for the propagation of the Mother Church's interest, to keep secret and private all her agents' counsels from time to time as they interest me, and not divulge, directly or indirectly, by word, writing or circumstances whatever, but to execute all that should be proposed, given in charge, or discovered unto me by you, my Ghostly Father, or any of this sacred order.

" 'I do further promise and declare that I will have no opinion or will of my own, or any mental reservation whatsoever, even as a corpse or cadaver (perine Ac cadaver), but will unhesitatingly obey each and every command that I may receive from my superiors in the militia of the Pope and of Jesus Christ.

" 'That I will go to any part of the world whithersoever I may be sent, to the frozen regions north, jungles of India, to the centers of civilization of Europe, or to the wild haunts of the barbarous savages of America without murmuring or repining, and will be submissive in all things whatsoever is communicated to me.

" 'I do further promise and declare that I will when opportunity presents make and wage relentless war, secretly and openly, against all heretics, Protestants and Masons, as I am directed to do, to extirpate them from the face of the whole earth; and that I will spare neither age,

sex or condition, and that I will hang, burn, waste, boil, flay, strangle, and bury alive these infamous heretics; rip up the stomachs and wombs of their women, and crush their infants' heads against the walls in order to annihilate their execrable race. That when the same cannot be done openly I will secretly use the poisonous cup, the strangulation cord, the steel of the poniard or the leaden bullet, regardless of the honor, rank, dignity or authority of the persons, whatever may be their condition in life, either public or private, as I at any time may be directed so to do by any agents of the Pope or superior of the Brotherhood of the Holy Father of the Society of Jesus.

" 'In confirmation of which I hereby dedicate my life, soul and all corporal powers, and with the dagger which I now receive I will subscribe my name in my blood in testimony thereof; and should I prove false or weaken in my determination, may my brethen and fellow soldiers of the militia of the Pope cut off my hands and feet and my throat from ear to ear, my belly be opened and sulphur burned therein with all the punishment that can be inflicted upon me on earth and my soul shall be tortured by demons in eternal hell forever.

" 'That I will in voting always vote for a K of C in preference to a Protestant, especially a Mason, and that I will leave my party so to do; that if two Catholics are on the ticket I will satisfy myself which is the better supporter of Mother Church and vote accordingly.

" 'That I will not deal with or employ a Protestant if in my power to deal with or employ a Catholic. That I will place Catholic girls in Protestant families that a weekly report may be made of the inner movements of the heretics.

" 'That I will provide myself with arms and ammunition that I may be in readiness when the word is passed or I am commanded to defend the church either as an individual or with the militia of the Pope.

" 'All of which I, . . . . . . do swear by the blessed Trinity and blessed sacrament, which I am now to receive, to perform and in part to keep this my oath.

" 'In testimony hereof I take this most holy and blessed sacrament of the Eucharist, and witness the same further with my name written with the point of this dagger dipped

in my own blood and seal in the face of this holy sacrament.'

"(Excerpts from 'Contested election case of Eugene C. Bonniwell against Thomas S. Butler,' as appears in the Congressional Record—House, Feb. 15, 1913, at pages 3215 et seq. and ordered printed therein by unanimous consent. Attached hereto and printed (one page 3216) as a part of said report as above.)"

In passing it may be stated that the true obligation taken by the members of the fourth degree of the Knights of Columbus was brought out through the testimony of one of the officers of that order. It is as follows:

"I, upon my honor as a Catholic Gentleman and Knight of Columbus (*sic*) never to reveal directly or indirectly by word or deed any, even the slightest details, of the doings of this order as they occur in this or any other council not absolutely known to be an equallified brother in good standing. This promise shall not conflict with my religious or civil duties. I promise not to comment upon the degree favorably or otherwise in the presence of strangers thereto in order to make comparisons of one degree with another. I further promise not to use or imitate any of the degree work of this order in any way outside of the same. These promises I regard as binding and constant upon me until death.

"I pledge myself as a Catholic citizen and Knight of Columbus to enlighten myself fully upon the duties as a citizen and to conscientiously perform such duties entirely in the interest of my country and regardless of all personal consequences. I pledge myself to do all in my power to preserve the integrity and purity of the ballot and to promote reverence and respect for law and order. I promise to practice my religion consistently and faithfully but without ostentation, and to so conduct myself in public affairs and in the exercise of public duties as to reflect nothing but credit upon our holy church to the end that she may flourish and our country prosper to the greater honor and glory of God."

It further appeared in evidence that the key-note of the fourth degree of the order was patriotism to the principles of our government.

Defendant admitted that there was no oversight or mistake in connection with the publication, and that his act

was intentional; but claimed that the article was published without malice, and that his motive in publishing the same was honorable and done with a desire to be fair to the members of both organizations. He testified that his act was the outcome of a more or less political and religious controversy which had taken place at Washington at the end of the previous year in connection with the alleged un-American and intolerant and bigoted teachings of a certain organization, and that he had noticed that the principal people who were parties to the institution of a congressional investigation of the order known as the Ku Klux Klan were largely members of the Knights of Columbus or Roman Catholics. He claimed that in view of the investigation in 1921 it was within his privilege as a publisher and editor to copy from the Congressional Record the pretended oaths of the different orders, especially as he had made particular reference to the proceedings published in the governmental publication. The issue of the publication referred to in the published article was introduced in evidence. It appeared therefrom that in a contested election case heard before the House of Representatives charges were made by a defeated candidate that his successful opponent had promoted the circulation of this same so-called oath to the detriment of contestant, who was a member of the Knights of Columbus. The congressional committee appointed to investigate the charges found that the so-called oath had been circulated, but that the successful candidate had disavowed his belief in it and had done whatever he could to prevent its circulation. It also branded it as false and libelous.

Defendant herein offered no proof whatsoever of the truth of his charge that the so-called oath was taken by the members of the Knights of Columbus, contenting himself merely with the defense that he had published it in good faith and without any desire to impeach the honesty or integrity of any member of that organization. To refute this asserted honest intention the prosecution proved that defendant knew at the time of the publication that the congressional committee had condemned the so-called oath as being false and libelous. It also proved that he knew that men high in Masonic circles had upon investigation found that it was false, and that they had published an open statement in which it was declared that the Knights of Co-

lumbus as an organization was dedicated to charity and patriotism, and that it stood for law and order. In addition thereto it was in evidence that in subsequent numbers of his magazine and after his arrest defendant republished the oath, and also published the statement that he was being tried for a crime that he did not and could not commit, namely, libeling the K. C.'s, and which he explained at the trial as meaning that the organization was depraved and its members were beneath contempt, and therefore incapable of being libeled. Other testimony was introduced to negative the honesty and good faith of defendant in publishing the article in question.

[1] The evidence upon the subject conclusively shows that defendant published the article knowing it to be untrue and without justifiable ends, and for the sole purpose of injuring the members of that society by discrediting their honesty, integrity, and reputation, and with a desire to expose them, and David Supple as a member thereof, to public hatred, contempt, or ridicule, and that the so-called oath was false, and that neither David Supple nor any other member of the fourth or any other degree of the order ever took such an oath; and defendant made no attempt to refute this evidence or to prove that such an oath was taken.

There is, therefore, no merit in the contention that the evidence is insufficient to establish malice.

[2] Equally without merit is the plea of privilege. The Penal Code (sec. 254) provides in substance that no reporter, editor, or proprietor of any newspaper is liable to prosecution for a fair and true report of any judicial, legislative, or other public official proceedings except upon proof of malice in making such report, and that malice is not to be implied from the mere fact of publication. This section, however, does not afford immunity to one who has willfully and maliciously distorted a statement found in a legislative publication by intentionally publishing fragmentary and incomplete parts thereof which do not indicate a fair summary of the whole proceedings. Here there was a clear intimation that the publication was stamped with the approval of the congressional committee at Washington, no mention being made of the circumstances under which it was printed or that the committee found that the oath was false.

[3] The further point is urged that no public offense is alleged against defendant. In this connection it is claimed that the information does not by direct allegation or by innuendo charge that defendant intended to have it understood that the members of the fourth degree ever administered or took the oath.

There is no merit in this contention. The information expressly alleges that the defendant did willfully and maliciously print and publish a certain false and malicious libel and defamation of and concerning the members of the fourth degree of the Knights of Columbus and of and concerning David Supple. [4] When the words in their plain natural meaning are actionable *per se* no innuendo is required. The office of the innuendo is to point out and to refer to matters already expressed; to explain the meaning of the publication when it is obscure, and to designate the persons alleged to have been libeled when they are alluded to in covert and ambiguous terms (25 Cyc. 449, 575).

[5] In order to render one amenable to prosecution for publishing or circulating libelous matter it is not necessary that such matter name the individuals or any of them composing the class against whom the matter complained of is published. The members of the fourth degree as a class are expressly stated to have been libeled. In *People* v. *Turner,* 28 Cal. App. 766 [154 Pac. 34] where this question was raised, it is expressly held that the law is elementary that a libel need not be of a particular person, but may be upon a class of persons, if the tendency of the publication is to stir up riot and disorder and incite to a breach of the peace. (See, also, *People* v. *Crespi,* 115 Cal. 50 [46 Pac. 863]; *Crane* v. *State,* 14 Okl. Cr. 30 [19 A. L. R. 1455, 166 Pac. 1110].) The information sufficiently charges the crime of libel.

Other points refer to alleged misconduct of the prosecutor. We have examined them and find them to be without merit.

In conclusion, it may be stated that it is to be regretted that sectarian bitterness with reference to religion should still exist in this enlightened age. As was said in *Crane* v. *State, supra,* where this identical so-called oath was involved, "It is remarkable that in this country, where free-

dom of conscience in religious matters was one of the chief basic doctrines upon which the government was founded, people who hold themselves forth as possessing even ordinary intelligence would indulge in this character of criminal conduct. The fundamental law of both the state and the nation guarantees to each individual the right to associate himself with any religious creed of his own selection, and no person of any other faith has the right to interfere with or publish false statements concerning the individual or the organization nor its lawful mode or method of religious worship.''

The judgment is affirmed.

St. Sure, J., and Richards, J., concurred.

A petition by appellant to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on November 1, 1923.

All the Justices concurred.