**FAWCETT PUBLICATIONS, INC.,**
Plaintiff in Error,

v.

**Dennit MORRIS, Defendant in Error.**

No. 39485.

Supreme Court of Oklahoma.

July 17, 1962.

Rehearing Denied Oct. 11, 1962.

Dissenting Opinion Oct. 16, 1962.

44

Butler, Rinehart & Morrison, Oklahoma City, for plaintiff in error, Fawcett Publications, Inc., and cross-defendant in error, Mid-Continent News Co.

Robert G. Grove, Leo Winters, Oklahoma City, for defendant in error and cross-plaintiff in error, Dennit Morris.

JACKSON, Justice.

In the trial court, plaintiff Dennit Morris sued Fawcett Publications, Inc., the publisher of "True" Magazine, and Mid-Continent News Company, its distributor, for damages for libel. The suit grew out of an article in a 1958 issue of "True" Magazine entitled "The Pill That Can Kill Sports", concerning the use of amphetamine and other similar drugs by athletes throughout the country.

Plaintiff alleged in his petition that he was a member of the 1956 Oklahoma University football team; that the article imputed to him a crime against the laws of the state of Oklahoma and was libelous per se; and asked for general damages in the amount of $100,000, and punitive damages in the amount of $50,000.

At the conclusion of the evidence, the trial court instructed the jury to return a verdict against Fawcett, leaving only the amount of the damages for jury determination. Mid-Continent's motion for directed verdict in its favor was sustained.

The jury returned a verdict for plaintiff and against Fawcett in the amount of $75,000 for actual damages.

Fawcett is a foreign corporation without a service agent in this state, and service was had upon Fawcett herein by serving the Secretary of State pursuant to statute. On appeal, Fawcett, for its first proposition, argues that the court had no jurisdiction for the reason that Fawcett was not "doing business" in the state within the meaning of 18 O.S.1961, Sections 1.17 and 472, which authorize service upon the Secretary of State.

From uncontradicted evidence in the record, it appears that Fawcett had contracted with Mid-Continent to distribute its magazines in a portion of the State of Oklahoma. The "territory" is not described in the contract, and is left for all practical purposes to the discretion of Fawcett. Magazines were to be forwarded to Mid-Continent without specific orders, in amounts entirely within the discretion of Fawcett. Mid-Continent agreed to distribute not only the magazines and books named in the contract, but all "other matter" which Fawcett might choose to forward. All prices, sales dates and release dates were to be fixed by Fawcett and were subject to change at any time by Fawcett. Mid-Continent agreed to keep dealer records acceptable to Fawcett, showing "initial distribution, re-orders, pickups, returns and net sales". Provision was made for "returns", and credit thereon, and Mid-Continent agreed to dispose of unsold copies in any manner Fawcett should direct. Mid-Continent agreed to distribute to its retail dealers all "advertising, dealers' helps, posters, circulars, and other material" which Fawcett chose to supply. It agreed to furnish Fawcett a complete list of its dealers, showing address and line of business, and showing each dealer's "draw" of each of Fawcett's magazines, publications and other matter. The contract was for 10 years, but could be terminated by either party "at any time with or without cause by giving ten (10) days written notice" to the other party.

Fawcett also employed a "traveling representative" whose duty it was to call on both wholesalers and retailers, to "check up" on the manner of distribution, display and sale of Fawcett's publications and other matter. He testified that the wholesalers " * * * have an agreement with our company to do certain things, such as the putting out of our magazines on certain dates and displaying them in certain ways in the retail outlets, drugstores, supermarkets and so forth, and it is just my job to go around and see that they are fulfilling their agreement with our company". Although he testified that he actually had no authority, he did make reports to Mid-Continent and to his home office concerning his findings. He also made "suggestions" to Mid-Continent and the retailers as to the proper display and sale of his company's publications.

It thus appears that although the contract refers to Mid-Continent as an independent contractor, Fawcett retained almost unlimited discretion as to the details of the distribution, promotion, display and sale of its publications.

It should be noted here that the jurisdictional question raised in the brief of plaintiff in error (Fawcett) is restricted entirely to the question of whether Fawcett was "doing business" in Oklahoma within the meaning of 18 O.S.1961 §§ 1.17 and 472. No question of due process under the Fourteenth Amendment of the United States Constitution is presented.

The question of whether a foreign corporation is "doing business" within this state within the meaning of the statute must depend upon the facts in each particular case. Howes Company v. W. P. Milling Co., Okl., 277 P.2d 655 at page 657; 20 C.J.S. Corporations § 1920, at page 151.

In Wills v. National Mineral Co., 176 Okl. 193, 55 P.2d 449, this court held:

"Doing business involves not only ownership, possession or control of property, but also such functions as dealing with others in reference thereto, the exercise of discretion, the making of business decisions, the execution of contracts, the marketing of products by advertising and solicitation, collecting accounts, and kindred functions.

Wherever an important combination of these functions is being performed, it is the doing of business at the place of such performance."

Without belaboring the question of when title to the magazines published by Fawcett actually moved to Mid-Continent (and thus the question of whether Fawcett owned property in Oklahoma) we have no doubt that Fawcett had practical *control* over such property even after it had reached the magazine racks of the retailer. As shown above, practically unlimited discretion, under the Fawcett contract with Mid-Continent, was reserved in Fawcett. As to the "marketing of products by advertising and solicitation", under the contract Mid-Continent was bound to distribute any advertising matter the company might send; as to solicitation, Mid-Continent was bound to "cooperate with *the Company's plans* to increase the sale of its magazines" (emphasis supplied). Note that Fawcett was *not* required to cooperate with Mid-Continent's plans. From the practical standpoint, Fawcett could diminish or increase Mid-Continent's territory at will; it could set up and do business with any other competing distributor; it could require "check-up" reports on the retailers as often as it desired; it could send Mid-Continent as many, or as few, copies of any particular publication as it deemed advisable; it could cancel the contract without cause upon ten days' notice.

■ Considering the terms of the contract, and the activities of Fawcett's "traveling representative", we are forced to the conclusion that for all practical purposes Mid-Continent was little more than a mere conduit through which Fawcett exercised its own free and unhampered discretion as to all pertinent details of the business. Such being the case, and pursuant to the cited rule from Wills v. National Mineral Company, supra, Fawcett was doing business in Oklahoma within the meaning of 18 O.S.1961 §§ 1.17 and 472. It follows that service upon the Secretary of State was authorized in this case, and that the court had jurisdiction of the defendant so served. Defendant's first proposition is therefore without merit.

The remaining propositions urged on appeal go to the merits of the case, and we therefore summarize the alleged libelous publication. The article is approximately seven full pages in length; was studiously prepared after what purports to be painstaking research; and starts at pages 44 and 45 of the magazine. Across the center of pages 44 and 45, we find in large letters and bold type the following:

"THE PILL that can KILL SPORTS".

In the upper left hand corner of page 44 are these words: "Simply by using a phony letterhead, the author purchased by mail enough drugs to hop up over 100 football teams." Immediately under this statement is the following: "A SHOCKING REPORT:", which is emphasized by a red line underneath. In the middle of pages 44 and 45 is a picture of five bottles of pills; the sixth bottle is of the shape and type commonly used for hypodermic needle injections; and there are two hypodermic needles. In the upper right hand corner of page 45 is found the following:

"You can go to jail for selling amphetamine to a truck driver or injecting it into a racehorse, yet this same drug is being handed out to high school and college athletes all over the country."

In the lower half of page 45, and flowing over onto page 44, is pictured a heavily loaded dual-wheeled truck bearing the sign or label on its side, "DOPE". In the body of the truck are two individuals labeled "Avarice" and "Ignorance" shovelling out dope to athletes, including football players, who are running behind the truck and catching the pills. Another person is handing out pills to a football player from the cab of the truck. Above the engine of the truck are these words: "Victory at any Cost".

Across the center of pages 46 and 47 is a picture of a stable with the heads of horses appearing from the windows. In front of

the horses are what appear to be uniformed officials and trainers. Underneath this picture is printed the following: "Racehorses are scrupulously guarded against doping violations, yet the same drugs are given freely to young athletes."

While the article is too lengthy to be quoted, a few excerpts which appear to be fairly representative of the entire article are quoted as follows:

"Definite proof that doping was a common practice came on September 13, 1956, when I received this report from the USOA's attorney, John T. McGovern. 'I have communicated with record executives of Olympic, university, A.A.U. organizations, athletic directors and others * * * At every point of contact I was informed * * that substantially the entire population in schools and colleges have been using this type drug * * *.

*       *       *       *       *       *

"The *amphetamines are administered to athletes by* hypodermic injection, *nasal spray*, or in tablets or capsules, but pills are the most common form, at least according to those athletic figures who are willing to talk.

*       *       *       *       *       *

"There is, however, one statistic which is available, and which strongly indicates that consumption is rapidly increasing. Recently *I was able to buy 30 cc.'s of dextroamphetamine sulphate for 95 cents.* This amount—*enough to hop up an entire football team*—cost three times this much a few years ago. Also, I was able to buy a thousand amphetamine pills for $1.40 less than a third of the 1954 price. When sales go up, prices go down.

"*Speaking of football teams,* during the 1956 season, *while Oklahoma was increasing its sensational victory streak,* several *physicians observed Oklahoma players being sprayed in the nostrils with an atomizer. And during a televised game, a close-up showed Oklahoma spray jobs to the nation.* 'Ten years ago,' Dr. Howe observed acidly, 'when that was done to a horse, the case went to court. Medically, there is no reason for such treatment. If *players* need therapy, they shouldn't be on the field.'

*       *       *       *       *       *

"*The 'lifter'* (amphetamine user) can and *does become heroic, boisterous, pugnacious, or vicious.*

*       *       *       *       *       *

"*These results are what make amphetamines useful in the field of athletics.* They promote aggression, increase the competitive spirit, and work the same as the epinephrine (adrenalin) produced in your body. The adrenal cortex, however, is wiser than victory-hungry coaches and athletes, * * *." (Emphasis supplied.)

The article refers to several nationally known brutal crimes as being committed by users of amphetamine.

Plaintiff's evidence at the trial shows that the substance administered to Oklahoma players and members of the 1956 football team was "spirits of peppermint", a harmless substance used for the relief of "cotton mouth", or dryness of mouth, resulting from prolonged or extreme physical exertion; that plaintiff did not use amphetamine or any other narcotic drug, and there was no evidence that any other member of the team used amphetamine or narcotic drugs.

Plaintiff's evidence further shows that plaintiff was fullback on the alternate squad of the 1956 football team; that he played in all games during the 1956 season, except two, when he was "side-lined" because of injuries; that the team won all ten regular games during the season and won the Bowl game at the end of the season in Miami, Florida; that plaintiff played in the Bowl game; that plaintiff was a sophomore in 1956 and continued to play on the team in 1957 and 1958; and that he was a member of the University baseball team while at the university. That there were sixty or seventy members of the team in 1956.

Plaintiff's evidence further shows that many people asked plaintiff about the article in True, beginning shortly after its publication, and continuing until shortly before trial.

In Fawcett's answer it was alleged that the facts set forth in the article were true; that the comments were fair and fairly warranted by the facts truly stated; that the article was privileged; that defendant was without malice and relied upon trustworthy sources; and that the article did not refer to plaintiff. However, since no attempt was made to prove any of these allegations it may be said that the article, together with plaintiff's evidence is undisputed.

In Fawcett's second proposition it is said:

"The Article is not libelous per se.

"(A) The plaintiff was not named or referred to in the Article.

"(B) No person understood or believed the Article referred to the plaintiff.

"(C) The Article does not allege the plaintiff engaged in criminal activity and is not libel per se.

"(D) Plaintiff is a member of a large and changing group class and therefore the article is not libel per se."

We think the first question requiring attention under Fawcett's second proposition is whether the article is defamatory or libelous on its face. In this connection the courts have classified libelous words in the following categories: (See Kee v. Armstrong, Byrd & Co., 75 Okl. 84, 182 P. 494, 5 A.L.R. 1349)

"Words charged to be libelous may be divided into three classes: First, those that cannot possibly bear a defamatory meaning; second, those that are reasonably susceptible of a defamatory meaning, as well as an innocent one; third, those that are clearly defamatory on their face."

In determining whether the article is libelous on its face the article must be measured by its natural and probable effect upon the mind of the average lay reader.

Hargrove v. Oklahoma Press Publishing Co., 130 Okl. 76, 265 P. 635.

In 12 O.S.1961 § 1441, libel is defined as a false publication by writing, printing, or picture, which exposes any person to public hatred, contempt, ridicule or obloquy, or which tends to deprive him of public confidence, or to injure him in his occupation.

After reading the entire article and considering its effect upon the mind of the average lay reader, we are convinced that the article is clearly defamatory on its face and does expose the entire O. U. team to public hatred and contempt and tends to deprive the team and its membership of public confidence. The reader was unequivocally informed that the members of the team illegally used amphetamine; the article explained that amphetamine could be administered with a nasal spray and that for 95 cents one could purchase "enough to hop up an entire football team". The use of the phrase "hop up" negates any implication that the amphetamine was legally administered under the direction of a physician for medical purposes. The reference to the 1956 O. U. football team is so well tied into, or interwoven, into the article that the full weight and import of the article falls upon the O. U. team.

Having concluded that the article is defamatory and libelous on its face we think it follows that the article is *libelous per se*. However, in view of the prominence given to the subject of *libel per se* in Fawcett's brief and its contention that plaintiff's name must appear in the face of the article; and the superficial lack of harmony in the decisions from this court on what constitutes libel per se, we find it appropriate to consider the matter extensively.

Fawcett states that words alleged to be libelous fall within one of three categories as set forth in our quotation from Kee v. Armstrong, supra. That is: (1) those that cannot bear a defamatory meaning; (2) those that are reasonably susceptible of a defamatory meaning as well as non-defamatory meaning, and, (3) those whose only meaning is defamatory *of the plaintiff* on

its face. It should be noticed at the outset, however, that our quotation of the first syllabus from Kee v. Armstrong, supra, does not contain the words "of the plaintiff".

Fawcett then states that the second class of libel, supra, "is referred to as libel per quod or libel per innuedo while the third class of libel is libel *per se*." We are in complete agreement that the third class is libel per se. However, we do not agree (as Fawcett seems to conclude) that it is necessary for plaintiff's name to appear in the article to render it libelous per se. The article in True falls into the third catagory.

Kelly v. Roetzel (1917), 64 Okl. 36, 165 P. 1150, and Oklahoma Pub. Co. v. Tucker (1927), 124 Okl. 202, 254 P. 975, are cases wherein this court held that the *words used* in the articles were *defamatory per se* and that each of the articles was *libelous per se*. The publications complained of in those cases did not name the plaintiff.

Fawcett invites our attention to Hargrove v. Oklahoma Press Pub. Co. (1928), 130 Okl. 76, 265 P. 635; Fite v. Oklahoma Pub. Co. (1930), 146 Okl. 150, 293 P. 1073; Wimmer v. Oklahoma Pub. Co. (1931), 151 Okl. 123, 1 P.2d 671; Tulsa Tribune Co. v. Kight (1935), 174 Okl. 359, 50 P.2d 350; and Marland Ref. Co. v. Harrel (1934), 167 Okl. 548, 31 P.2d 121, wherein we said, or held, as follows:

"A publication is actionable per se when the language used therein is susceptible of but one meaning, and that an opprobrious one, *and the publication on its face shows that the derogatory statements, taken as a whole, refer to the plaintiff, and not some other person.*" (Emphasis supplied.)

If we correctly understand Fawcett's argument it is to the effect that the cited cases are authority for the proposition that the plaintiff must be named in the face of the article. This requires an examination of those cases.

In Hargrove, supra, the libelous publication was directed at William Hargrove, "a Negro". In the article it was said that "Hargrove's wife appeared at the office of the United States marshall * * * and paid Hargrove's fine." William Hargrove's wife, Florence Hargrove, a white woman, filed an action for damages upon the theory that she had been libeled. Ths court found that the article was *about* William Hargrove *and not* about Florence Hargrove. Obviously the court felt that it made a difference as to *whom* the article was written about. The applicable law where the article is not *about* the plaintiff is considered in an annotation in 69 A.L.R. at page 734, entitled "publication or statement as defamatory, by reason of extrinsic facts, of person not referred to nor intended to be referred to". However, this court in attempting to find the applicable law utilized the last above emphasized quotation which was taken from Rowan v. Gazette Printing Co., 74 Mont. 326, 239 P. 1035. (See Hargrove, supra.) The Rowan case dealt with a libelous article wherein the circumstances related cast suspicion upon any one (but only one) of five or six people, all of whom were named in the article. Obviously the law applicable in the Rowan case did not apply precisely to the Hargrove case.

In Fite, Wimmer, and Tulsa Tribune, supra, the problem was *what* was libelous per se and not *who* was libeled. In fact in these cases the plaintiffs were named on the face of the allegedly libelous publications.

In Marland Refining Co., supra, the libelous affidavit referred to a distributor of Marland products who may have been in Sapulpa, Ponca City, or any other place in Oklahoma where Marland products were being sold. Plaintiff was a distributor in Sapulpa, but not necessarily the one libeled. In the Marland case the court correctly followed the rule from the Montana case as expressed in the Hargrove case.

Fawcett also refers to Owens v. Clark (1931) 154 Okl. 108, 6 P.2d 755, wherein the court again utilized the rule announced in the Montana case and followed in Hargrove, Fite and Wimmer, supra. It will be observed that the libelous article in the Owens case dealt with "certain members" of the Oklahoma Supreme Court and not

*all* of its members. Without attempting to defend the Owens case we do observe that it is distinguishable from the case now under consideration. In that case the court said:

> "The article was not published about the Supreme Court, *but about certain members* of the Supreme Court * *. (Emphasis supplied.)
>
> *   *   *   *   *   *
>
> "We are not unmindful of the rule that one who publishes matter about a board or jury or family in its collective capacity assumes the risk of its being libelous."

One obvious distinction between the Owens case and the instant case is that the article by Fawcett in True magazine is levelled at the entire team.

■ The rule that it is not necessary for plaintiff to be identified by name in the libelous article is lucidly explained in National Ref. Co. v. Benzo Gas Motor Fuel Co., 20 F.2d 763, 55 A.L.R. 406, wherein it is said:

> "*   *   *   Whether an article is of a libelous character per se, and whether it has application to a particular party plaintiff, *are entirely distinct questions*, and should not be confused. The answer to the first question is to be found in the article itself. The answer to the second question is to be found in the proof supporting proper allegations in the complaint. Those proofs may consist of either of the article itself, *or of extrinsic* evidence." (Emphasis supplied.)

The statement just quoted is in harmony with 12 O.S.1961 §§ 303 and 1444, and the better reasoned decisions from this and other courts. See Chapa v. Abernethy, Texas Civil Appeals, 175 S.W. 166; E. I. DuPont de Nemours & Co. v. Nashville Banner Pub., 6 Cir., 12 F.2d 231; and annotation appearing in 91 A.L.R. at pages 1163, 1169, and 1171.

The additional and final legal argument presented under Fawcett's second proposition is that a defamatory publication concerning a large group is not libelous per se as to an unnamed member of that group. In this connection it appears that the courts have generally held that defamatory words used broadly in respect to a large class or group will not support a libel action by an individual member of the group. 70 A.L.R. 2d 1382. This doctrine appears to stem from the early decision of Sumner v. Buel, 12 Johns 475 (New York 1815), wherein the court concluded that a *civil* action would not lie for a libelous publication against all of the nine officers of three named rifle companies, because of the uncertainty as to who was libeled. In that case the court said:

> "*   *   *   A writing which inveighs against mankind in general, or against a particular order of men, is no libel, nor is it even indictable. It must descend to particulars and individuals, to make it a libel. (3 Salk. 224, 1 Ld. Raym. 486)."

We have examined the cited case, King v. Alme & Nott, as reported in 3 Salk. 224 (1700), 91 English Reports 790, and notice that the head notes refer to King v. Orme and Nott as the same case, reported in Trin. 11 Will. 3, B.R. 1 Ld.Raym. 486, 91 English Reports 1224. In our examination of the case as reported in these two citations it is apparent that it was a criminal case, but moreover it appears from King v. Orme and Nott that the reason why the indictment was set aside was because the jurors were unable from the proof to determine who had been libeled. In that report it was said:

> "An indictment for a libel upon persons to the jurors unknown is insufficient even after verdict. * * * For the jurors did not know the persons who were affected by the libel; therefore they could not properly say that the matter was false and scandalous, when they did not know the persons of whom it was spoken; nor could they say that any one was defamed by it."

Thus it is quite apparent that the case is not authority for the proposition that plaintiff in a suit based upon a libelous publication against nine identifiable officers of three named rifle companies could not recover in a libel action. In 34 Columbia Law Review, beginning at page 1332, is a very thorough and studiously prepared article entitled "Liability for Defamation of a Group." In the article it is said of Sumner v. Buel, supra, that "the misinterpretation of a dictum in an early English criminal libel case (King v. Alme, supra) gave rise to the doctrine that because of the absence of specific mention of any person, no action would lie for a statement of this nature."

Sumner v. Buel, supra, is explained in People v. Eastman, 188 N.Y. 478, 81 N.E. 459, in the following language:

"* * * the charges in the article (Sumner v. Buel) being against a *whole class* no single individual could maintain an action for libel against the author, * * * but not so, however, as regards a criminal prosecution for libel." (Emphasis supplied.)

Sumner v. Buel did not involve a *whole class* (but only nine officers who were easily identified—see the strong dissenting opinion). Furthermore, that court utilized a criminal case to support its decision in a civil case, but it was observed in People v. Eastman that the civil case of Sumner v. Buel could not be used in support of a criminal case. People v. Eastman was later used by our Court of Criminal Appeals in pointing up a distinction between group libel in civil and criminal cases. Crane v. State, 14 Okl.Cr. 30, 166 P. 1110, 19 A.L.R. 1455.

From our examination of the authorities we have reached the conclusion that the English courts have never barred recovery in Group libel cases unless the group is extremely large. In Ortenberg v. Plamondon et al., Quebec Court of Appeals, 35 Can. Law Times 262, American Annotated Cases, Ann.Cas.1915C, Page 347, it was held that a member of the Jewish race in Quebec, consisting of 75 families out of a total city population of 80,000 people, could maintain an action of defamation of the entire group even though he was not assailed individually, but only as a member of the group.

In 23 L.R.A.,N.S., 726, the author of the annotation finds a distinction between "Class libel" and "Group libel". He concludes from the cases cited that a member of a "Class" which has been libeled may not maintain an action for libelous matter in derogation of a class. In reference to "Group libel", he concludes:

"If the defamatory matter is used toward the entire group—that is, includes all of them,—it may generally be said to refer to each, so that each may sue. On the other hand, if the language is used indefinitely or impersonally toward one or a few of several members of a group, any member must establish its application to him in order to maintain his action."

In Anno., 97 A.L.R. 281, the author states:

"The general rule is that if defamatory language is used towards an entire group, including every one of them, it may be said to refer to each member of the group so that each may sue."

In 36 C.J. Libel and Slander, § 26; 53 C.J.S. Libel and Slander § 11, it is said:

"* * * on the other hand if the charge is against a class, and is, or may be, made of definite application, any one of that class may maintain an action upon showing that the words applied especially to him."

While there is substantial precedent from other jurisdictions to the effect that a member of a "large group" may not recover in an individual action for a libelous publication unless he is referred to personally, we have found no substantial reason why *size* alone should be conclusive. We are not inclined to follow such a rule where, as here, the complaining member of the group is as well known and identified in connection with the group as was the plaintiff in this

case. In 31 Columbia Law Review 1322, supra, in considering group libel, it said with good reason:

> " * * * the primary consideration would properly seem to be whether the plaintiff was in fact defamed, although not specifically designated. Considerations adduced in support of the absolute denial of recovery are inconclusive, as against the desirability of providing a remedy for actual injury.
>
> * * * * * *
>
> "A more realistic approach would recognize that even a general derogatory reference to a group does affect the reputation of every member, and would adopt as its test the intensity of the suspicion cast upon the plaintiff."

Measured by the foregoing considerations, and uncontradicted facts in this case, it cannot be successfully contended that the plaintiff was not defamed by the article in question.

■ We hold, in answer to Fawcett's second proposition, that since the article is libelous on its face without the aid of extrinsic facts to make it so, it is libelous per se; that the article libels every member of the team, including the plaintiff, although he was not specifically named therein; that the average lay reader who was familiar with the team, and its members, would necessarily believe that the regular players, including the plaintiff, were using an amphetamine spray as set forth in the article; that the article strongly suggests that the use of amphetamine was criminal; and that plaintiff has sufficiently established his identity as one of those libeled by the publication.

In reaching the conclusion that plaintiff has established his identity in the mind of the average lay reader as one of those libeled, we are mindful that a full-back on the alternate squad of a university team who has played in nine out of eleven all victorious games in one season will not be overlooked by those who were familiar with the team, and the contribution made by its regular players. It should be remembered that plaintiff was a constant player, and not a part of the "changing" element of that group.

We conclude that Fawcett's second proposition is without substantial merit.

■ Fawcett's third proposition is that the article was qualifiedly or conditionally privileged. Our statutory definition of "privileged publication" (12 O.S.1961 § 1443) refers to the type of privilege commonly called absolute. It is not contended that the publication here comes within that definition. Qualified privilege, however, has broader scope. Definitions of qualified privilege are usually very general in nature and difficult of precise construction. See 53 C.J.S. Libel and Slander § 89 et seq.; 33 Am.Jur. Libel and Slander, Sec. 126. With regard to privilege generally, it is said that " * * * in order to be shielded * * on this ground, the communication must be a privileged one uttered on a privileged occasion by a privileged person to one within the privilege"; 53 C.J.S. Libel and Slander § 87. With regard to qualified, or conditional privilege, it is said in 53 C.J.S. Libel and Slander § 89, that "It relates more particularly to private. interests * * *." An examination of the cases in which the defense of qualified privilege has been held applicable reveals that as a general rule some special private relationship has been involved, such as fraternal, fiduciary, business, or professional. Such is not the case here. No special relationship is shown, and no privileged person or privileged occasion is shown.

■ We have examined the cases cited by Fawcett in support of this proposition and do not find them controlling under the facts presented in this case. We hold that the publication dealt with in this case was not a qualifiedly, or conditionally privileged publication.

In Fawcett's fourth proposition it is said that the court erred in excluding competent evidence during the cross-examination of the plaintiff. During cross-examination,

counsel for Fawcett inquired if plaintiff had not left the Oklahoma University in 1958 to play professional football in San Francisco. Upon receiving an affirmative answer the further question and proceedings were as follows:

"Q. Now, at San Francisco on a professional football team that you were with, did you hear people say that they used something?

"A. Yes sir."

"Mr. Grove (for plaintiff): 'If the Court please, I think that it is incompetent, irrelevant, and immaterial. What he did at the University of Oklahoma would be material, but some other team I think is immaterial and we object to it. He testified he didn't use it and it is immaterial whether others use it or not.'"

"The Court: 'I think that is right, that will be sustained.'"

■ It is urged in Fawcett's brief that this inquiry was made for the purpose of showing that players on the San Francisco team took stimulants and that plaintiff knowingly played with such team mates, and that such evidence was competent to establish plaintiff's reputation in order to establish what damages, if any, the plaintiff was entitled to receive.

■ Fawcett did not make an offer of proof and did not make disclosure of the reason for this line of inquiry. The statute, 12 O.S.1961 § 630, provides that formal exceptions to rulings of the court are not necessary but it does require that a party make known to the Court the action which he desires the Court to take and his grounds therefor. Since this was not done we cannot say that the trial court committed reversible error in sustaining the objection. Garret v. Lacquemont, Okl., 306 P.2d 696.

■ Fawcett's fifth proposition is that "TV, movie and photographic equipment in the courtroom and publicity resulting therefrom deprived defendant of a fair trial." In that connection, the record of the trial proper does not show that such equipment was used during the progress of the trial itself, and the only information in the record before us in that regard is contained in an ex parte affidavit of an attorney for defendant, attached to the motion for new trial. It tends to show that such equipment was used during times when the court was in recess, and with the consent and under the supervision of the court. On this showing, we are unable to say that defendant was deprived of a fair trial.

■ The sixth proposition is that the admission of evidence of the financial worth of defendant prevented defendant from having a fair trial.

It is well settled that in an action wherein punitive damages are proper, evidence of the financial worth of the defendant is competent and admissible. Smith v. Autry, 69 Okl. 28, 169 P. 623. In the petition herein, plaintiff asked for punitive damages, and the evidence was sufficient to support punitive damages if the jury had awarded the same.

Defendant, Fawcett, makes a further argument under this proposition to the general effect that under the circumstances existing in this case, plaintiff had the burden of proving malice on the part of the defendant; that he did not do so and was therefore not entitled to punitive damages; that the evidence of defendant's financial condition was therefore not admissable. However, under the authorities cited by defendant, this is true only where the publication is privileged. As we have seen, such is not the case here.

Fawcett's last proposition is that the damages awarded here were excessive, and not justified by the law or the evidence.

■ In this connection, defendant points out that there was no proof of "pecuniary loss", and calls attention to the first sentence of 12 O.S.1961 § 1446, to the effect that a verdict for plaintiff in a libel action shall never be " * * * less than one hundred dollars and costs, and may be for a greater sum *if the proof justifies the same.*" (Emphasis supplied.) Defendant argues, in effect, that the verdict may not

be for more than one hundred dollars unless the proof *of damages* justifies the same. The words "of damages" are not in the statute, and we do not believe they should be read into the statute. To do so would be to limit the meaning of the word "proof" in a manner not apparent from the statute itself and not contemplated by the Legislature. Such an interpretation would also completely nullify the rule, well established when this section of the statute was enacted, permitting a recovery of general damages for libel per se without actual proof thereof. No legislative intention to that affect appears. We think the term "proof" as used in this section includes any proof on any point properly presented by either party in the presentation of the case. See Kelly v. Roetzel, supra.

■ On the question of the amount of damages, it is said that "determination of the amount of compensation that should be paid in a particular case is peculiarly a matter for the jury, although if the amount allowed is excessive the court may interfere"; and that " * * * such factors as the nature of the imputation made, the circumstances surrounding its publication, * * * and the general status and position of the parties, may all be taken into consideration". 33 Am.Jur. Libel and Slander, Sec. 209.

■ In the instant case, the defamatory publication imputed the commission of a crime—the illegal use of amphetamine; it was made in a magazine of general circulation; the natural result of such publication was to expose the plaintiff to hatred, ridicule and contempt; the plaintiff was a young man whose character and reputation was not questioned, and he was not guilty of the crime charged.

Considering these facts, and in view of the principle that the amount of general damages to be awarded in a libel action is peculiarly within the province of the jury, we are unable to say that the damages awarded here were excessive. 35 A.L.R.2d 218.

■ We now consider on behalf of plaintiff his proposition that the trial court erred in directing a verdict for the defendant Mid-Continent, and against the plaintiff. In support of this proposition plaintiff states that Mr. Albro, who was called as a witness for the plaintiff, testified that he was the manager of the Oklahoma City News Agency, a subsidiary of Mid-Continent; that he (Albro) testified that he read a newspaper article published concerning the article "The Pill That Can Kill Sports." Counsel says that the newspaper article referred to was dated February 8, 1958, and that in this newspaper article it was reported that an official at O. U. branded the article (in True Magazine) as wholly untrue. Plaintiff concludes therefrom that "Mid-Continent, through its agent (Albro) had notice of the nature of the article (in True) and of the denial which had been made as to the truthfulness thereof." For the foregoing reason plaintiff argues that Albro, having read the newspaper article prior to the distribution of True Magazine, it was error to direct a verdict in favor of Mid-Continent.

From our examination of the record we are unable to determine that Albro so testified. He did testify that he believed there was an article in the paper. He then testified:

"Q. Do you remember reading any article in the paper?

"A. No, I can't say as I do.

"Q. Do you remember any discussion that you might have had with anyone concerning this particular article?

"A. No."

The record does not show, as contended by plaintiff, that Mid-Continent had knowledge of the article prior to its distribution and we are unable to conclude from the argument that the trial court erred in directing a verdict for Mid-Continent.

The judgment in favor of plaintiff and against Fawcett Publications, Inc., is affirmed; and the action of the trial court in sustaining the motion for directed verdict and entering judgment for the defendant,

Mid-Continent News Company, is also affirmed.

WILLIAMS, C. J., and WELCH, JOHNSON and IRWIN, JJ., concur.

BLACKBIRD, V. C. J., and DAVISON and BERRY, JJ., concur in part and dissent in part.

HALLEY, Justice (dissenting).

It is impossible for me to agree with the majority opinion.

Nowhere in the alleged libelous article did it say that the use of amphetamine by the individual player was a crime. Neither did the paragraph in the article where the University of Oklahoma was referred to did it say that amphetamine was given to the players. Here is that paragraph:

"Speaking of football teams, during the 1956 season, while Oklahoma was increasing its sensational victory streak, several physicians observed Oklahoma players being sprayed in the nostrils with an atomizer. And during a televised game, a close-up showed Oklahoma spray jobs to the nation. 'Ten years ago,' Dr. Howe observed acidly, 'when that was done to a horse, the case went to court. Medically, there is no reason for such treatment. If players need therapy, they shouldn't be on the field.' "

There is nothing in the article that is libelous per se as to Dennit Morris. Nowhere does it say that he partook of the amphetamine nor does it say that he would have been violating the law if he had.

In Section 1441 of 12 O.S.1961, libel is defined as follows:

"Libel is a false or malicious unprivileged publication by writing, printing, picture, or effigy or other fixed representation to the eye, which exposes any person to public hatred, contempt, ridicule or obloquy, or which tends to deprive him of public confidence, or to injure him in his occupation, or any malicious publication as aforesaid, designed to blacken or vilify the memory of one who is dead, and tending to scandalize his surviving relatives or friends."

To me it is unthinkable that the article in question would expose Dennit Morris to public hatred, contempt, ridicule or obloquy or injure him in any way. He was trained by a highly respected coaching staff. His own evidence showed that he was a professional football player after leaving school and that he received employment with one of the major oil companies of this country.

For this judgment to stand up the article must be libelous "per se" which means by itself, simply as such in its own nature or without reference to its relations, and in connection with libel and slander is applicable to words which are actionable because they of themselves, without anything more, are opprobrious. Tulsa Tribune Co. v. Kight, 174 Okl. 359, 50 P.2d 350 (1935); Marland Refining Co. v. Harrel, 167 Okl. 548, 31 P.2d 121 (1934); Wimmer v. Oklahoma Pub. Co., 151 Okl. 123, 1 P.2d 671 (1931); Fite v. Oklahoma Pub. Co., 146 Okl. 150, 293 P. 1073 (1931); Hargrove v. Oklahoma Press Pub. Co., 130 Okl. 76, 265 P. 635 (1928).

In Libel and Slander, 53 C.J.S. § 8, we find this statement:

"In general, defamatory words may be divided into those that are actionable per se, which on their face and without the aid of extrinsic proof are recognized as injurious, and those that are actionable per quod, as to which the injurious character appears only in consequence of extrinsic facts."

To me the most that can be made of this article as to Dennit Morris is that it is "libel per quod" and failure of trial court to require plaintiff to plead and prove special damage constituted reversible error. Oklahoma Publishing Co. v. Gray, 138 Okl. 71, 280 P. 419. See also 53 C.J.S. Libel and Slander, §§ 162, 170 and 262.

I dissent.