Kay Sharon FRANKOVICH,
Plaintiff in Error,

v.

Franky V. FRANKOVICH,
Defendant in Error.

No. 42755.

Supreme Court of Oklahoma.

Oct. 7, 1969.

Miskovsky, Sullivan, Embry, Turner & Gregg, Oklahoma City, for plaintiff in error.

Lewis M. Watson, Ada, for defendant-cross petitioner in error.

LAVENDER, Justice:

This appeal began as an action for divorce by husband brought in the District Court of Pontotoc County, Oklahoma. The trial court granted the divorce to the husband and that portion of the judgment is not under attack here. The trial court also adjudged plaintiff to be the father of a female child born to defendant during the marriage; awarded custody of that child to defendant, and ordered plaintiff to make monthly payments for its support and maintenance. The trial court also awarded custody of a male child born of the marriage to its paternal grandparents. After the overruling of their respective motions for new trial, both parties have appealed here—the defendant, from the judgment placing the custody of the male child with its paternal grandparents, and the plaintiff, from the judgment concerning the paternity and orders for the support of the female child. The parties will be referred to by their respective trial court designations.

It is one of the defendant-wife's contentions that, although, at the time of the commencement of the action, both of the parties had been actual residents, in good faith, of the State of Oklahoma for many years, neither of them was a resident of Pontotoc County at the time of the filing of the plaintiff's petition and, therefore, the trial court was without jurisdiction to grant any relief. We shall consider that contention first.

The parties were married on July 24, 1965, at Konawa in Seminole County, Oklahoma, about a year after the plaintiff had entered the army. At the time he entered the army, the plaintiff was living with his parents near Asher in Pontotoc County, Oklahoma, and, quite clearly, considered that to be his "home" at the time of the marriage, while the defendant was living with her parents, in Seminole County, and, quite clearly, considered that to be her "home" at the time of the marriage. At least until late November or early December of 1965, the plaintiff would stay with the defendant at the home of her parents or at the home of his parents whenever he was in the vicinity on leave or on a week-end pass. In late November or early December of 1965, the defendant rented and moved into an apartment in Konawa, without the prior knowledge of the plaintiff, and, from then until he was sent to Germany by the army in March of 1966, the plaintiff spent a number of weekends and a 30-day leave with the defendant at this apartment in Konawa. On June 25th or 26th, 1966, the defendant moved to Oklahoma City and, on June 28, 1966, moved into an apartment in Midwest City, Oklahoma, and about four weeks later, moved into a house in Midwest City. The plaintiff returned to the states on leave on July 17, 1966, and the parties spent five days—July 26 through July 30—together, with two of those days being spent at Turner Falls and the other three days at her parents' home or at his parents' home, and separated on July 31, 1966. The plaintiff's petition for divorce was filed on August 4, 1966, and, at that time, his military records, including his then-current leave orders, still showed his "Home of Record" as "Route Two, Byars, Oklahoma," which was his mailing address, in Pontotoc County, when he entered the army.

In short, plaintiff contends that he was a resident of Pontotoc County at the time he entered the army and had not changed his residence, and that, therefore, the action was properly brought in that county.

In Bixby v. Bixby (1961), Okl., 361 P.2d 1075, this court held, in the first paragraph of its syllabus, that:

"The phrase 'actual resident' and the word 'resident' as used in Title 12 O.S. 1951 § 1272, as amended [in 1957], contemplate an actual residence with substantially the same attributes as are intended when the word 'domicile' is used;"

and, in the body of the opinion said, among other things:

" 'The question of domicile in an action for divorce is one of fact, to be determined from the evidence in the case. The controlling fact to be considered is the fact of intention and to determine this fact the trial court, and this court on appeal, may take into consideration all the movements, transactions, and attending circumstances of the party or parties involved in the question;' "

referring to Pope v. Pope, 116 Okl. 188, 243 P. 962. See also Greer v. Greer, 194 Okl. 181, 148 P.2d 156.

▌ Assuming (without deciding) that 12 O.S.1961, § 1272, as amended in 1965, allows a divorce action to be filed only in the county of which the plaintiff is then a resident or in the county of which the defendant is then a resident, and applying the principles of law set forth in Bixby v. Bixby, supra, the trial court's finding that, at the commencement of the action, the plaintiff was, and for more than six months prior thereto had been, an actual resident, in good faith, of the State cf Oklahoma, and, at the commencement of the action, was, and for more than thirty days prior thereto had been, an actual resident, in good faith, of Pontotoc County, and that the trial court had jurisdiction of the cause of action and of the parties thereto, is not clearly against the weight of the evidence. Consequently, that finding will not be disturbed by this court on appeal [Clark v. Clark (1961), Okl., 361 P.2d 207; McElreath v. McElreath (1957), Okl., 317 P.2d 225].

Shortly after filing his petition for a divorce, the plaintiff filed an application for an order awarding to the plaintiff or to the plaintiff's mother the temporary custody of a male child that had been born to the parties on February 20, 1966. After notice and hearing on August 17, 1966, at which both parties, their attorneys, and their parents were present, the trial court found that the defendant is not a fit and proper person to retain the custody of said minor child; that plaintiff should not be

awarded the actual physical custody of said child by reason of the fact that he is in military service and the additional basic psychological fact that an infant child should have the care and attention of a female custodian; that the best interests and the welfare of said child would best be served by placing said child with the paternal grandparents (who consented thereto); and ordered that the temporary custody of said minor child be placed with its paternal grandparents, with directions to them to accord the child's mother and maternal grandparents reasonable visitations with the child in the home of the custodians at such times as would not interfere with the health and welfare of the child.

Thereafter, the defendant filed an answer and cross-petition in which she alleged, among other things, that she was pregnant by the plaintiff and the child was expected to be born in April of 1967, and that she was without income or means to pay the necessary medical and hospital expenses in connection with the birth of said child, or for her maintenance and support and the maintenance and support of the children of the parties, and prayed that she be granted a divorce from the plaintiff, an equitable share of the property acquired by the parties during their marriage, alimony in money, the care, custody and control of the male child mentioned above and of the other child when born, and that the plaintiff be required to provide for the support and maintenence of said children and for expenses in connection with the birth of the expected child, and to pay the defendant's attorney fees and costs, accrued and accruing.

The plaintiff's reply and answer to the cross-petition expressly denied paternity of the defendant's expected child, and alleged that, by reason of the defendant's conduct, as alleged in his reply and answer, she was not entitled to any of the relief prayed for in her cross-petition. The defendant denied the allegations concerning her conduct.

On January 4, 1967, the defendant filed a motion alleging the conclusion that, since the making of the order of August 17, 1966, the conditions and circumstances surrounding the parties had materially changed to such extent that the best interest of the male child would be served by awarding his custory to the defendant, and praying that such order be modified so as to confide his care, custody and control in his mother, the defendant. After a hearing thereon, the trial court overruled that motion but did modify the order of August 17, 1966, so as to allow the defendant the right of visitation with the child, away from the home of its paternal grandparents, for specified periods of time on each weekend.

The plaintiff had returned to his military station in Germany shortly after the hearing of August 17, 1966, and was in military service in Vietnam when the case was tried on the merits on June 6, 1967. In the meantime, on March 18, 1967, the defendant had been delivered of a female child. At the trial, the record of the proceedings had on August 17, 1966, including a deposition by the plaintiff and the depositions of other witnesses upon behalf of the plaintiff, which had been taken a few days after the commencement of the action and had been received in evidence at the hearing of August 17, 1966, were received in evidence. At the close of the trial, the trial court took the cause under advisement and continued it until August 16, 1967, for the rendition of judgment. Judgment was rendered on that date.

In addition to finding that, at the commencement of the action, the plaintiff was, and for more than six months prior thereto had been, an actual resident, in good faith, of the State of Oklahoma and, at the commencement of the action, the plaintiff was, and for more than thirty days prior thereto had been, an actual resident, in good faith, of Pontotoc County, and that the trial court had jurisdiction of the action and of the parties, the trial court, in its journal entry of the judgment of August 16, 1967, found that the parties were married and were husband and wife at the time of the commencement of the action; that two children (naming the male child and the female child mentioned above) had been born of the marriage; and that, during their marriage, the parties had acquired no property other than the items of personalty in the possession of the respective parties.

In its journal entry of the judgment, the trial court also found (and rendered judgment accordingly): That a divorce should be granted to the plaintiff as prayed for in his petition (which alleged gross neglect of duty toward the plaintiff and the male child of the parties); that it would be for the best interests of the male child (naming him) that his care, custody, control and education be awarded to his paternal grandparents because of the comparatively stable and wholesome surroundings, with reasonable visitation rights in the defendant, including custody in the defendant every other weekend from 6:00 o'clock p. m. on Friday until 6:00 o'clock p. m. on Sunday, beginning on Friday, August 18, 1967, and on alternative weekends thereafter, and custody in the defendant during Christmas of 1967 and on alternate Christmases thereafter, and on Thanksgiving of 1968, and on alternate Thankgivings thereafter; that the plaintiff be compelled to pay to his parents, through the clerk of the court, as his contribution toward the support and maintenance of said male child, the sum of $50.00 per month, commencing with August of 1967; that it would be for the best interests of the female child (naming her) that her care, custody, control and education be awarded to the defendant (with the plaintiff to have the right and privilege to visit with the child on all reasonable occasions and at seasonable times) because of her extremely tender years and because the plaintiff has advised the court that he did not want her custody. I was further ordered that the plaintiff pay to the defendant, through the clerk of the court, as his contribution toward said child's support and maintenance, the sum of $50.00 per month, commencing with August of 1967; that the

plaintiff pay to the defendant's attorneys (naming them), an attorneys' fee in the amount of $250.00. It was the further order that all orders theretofore made by the court be vacated and merged in the decree.

Each of the parties filed a motion for a new trial, and both motions were overruled by the trial court.

■ In her appeal herein, the defendant presents her remaining arguments under two propositions: One, that the trial court ruled contrary to law and failed to act in the light of the child's best interest in awarding custody of the male child of the parties to the plaintiff's parents; and the other one, that the trial court erred in failing to grant the defendant any temporary alimony or any temporary attorney fee for her attorneys.

In connection with this last-mentioned contention, the defendant recognizes that the awarding of temporary alimony and temporary attorney fees rests in the sound discretion of the trial court, and argues that the trial court abused its discretion by failing to award her any money during the pendency of the action. We note that, although the defendant's answer and cross-petition alleged that she was without income, means or resources and prayed for a divorce from the plaintiff and that he be required to pay support money for her and the children involved herein, medical and hospital expenses in connection with the birth of her expected child, court costs and attorney fee, and although, after filing her answer and cross-petition, the defendant did present to the trial court a motion to modify its prior order concerning the custody of the male child of the parties so as to award his custody to her, there is nothing in the record before us to indicate that the matter of temporary allowances of any kind was ever presented to the trial court. In the circumstances, we do not think that it can reasonably be said that the trial court abused its discretion in failing to award her any temporary

support money or attorney fees. Also, see 12 O.S.1961 § 630, which requires that a party make known to the court the action which he desires the court to take and his grounds therefor [Fawcett Publications, Inc. v. Morris (1962), Okla., 377 P.2d 42, 53], and cases such as Labor Investment Corporation v. Russell (1965), Okl., 405 P.2d 1008, and Midwest City v. Eckroat et al. (1963), Okl., 387 P.2d 123, which hold that matters not presented to or considered by the trial court will not be considered by this court on appeal.

■ The defendant's argument concerning the trial court's action in awarding the custody of the male child of the parties to its paternal grandparents instead of to her is bottomed upon the premise that the trial court, in its final decree, did not find that she was not a fit and proper person to have its custody, but to the contrary, in awarding the custody of the female child to her, must have found that she was a fit and proper person to have the custody of a child of tender years. Then, upon that premise, she relies upon cases such as Neet v. Neet (1947) 198 Okl. 386, 179 P.2d 120; Blackwood v. Blackwood (1951), 204 Okl. 317, 229 P.2d 602, and Miracle v. Miracle (1961), Okl., 360 P.2d 712. In the Miracle case, this court said (at pages 715 and 716):

"Our courts have recognized that mother love is a dominant trait in the heart of a mother. It is of divine origin, and in nearly all cases far exceeds and surpasses the parental affection of a father. Every one recognizes the fact that a child of tender years needs the constant bestowal of a mother's care and love. It is for these reasons courts are loath to deprive the mother of the care and custody of a child, *if she is a fit and proper person*. See Bruce v. Bruce, 141 Okl. 160, 285 P. 30." (Emphasis supplied)

In the Blackwood case, this court, after referring to its holding in Wallace v. Wal-

lace, 145 Okl. 303, 292 P. 1111, said (at page 604 of the Pacific report):

"*  *  * The effect of that holding is that *where the mother is found to be a fit and proper person to have the custody of the child of tender years* it becomes the duty of the court, under the statute, to so award the custody. *In view of the express finding in the instant case that the mother was a fit and proper person to have such custody,* we hold that the court erred in not awarding the exclusive custody to the mother." (Emphasis supplied)

And, in the Neet case, wherein there was no evidence to substantiate the father's charge of immoral conduct on the part of the mother and that she had become an habitual drunkard, this court held, in the third paragraph of its syllabus:

"A decree divesting the mother of the care and custody of a minor daughter, *in the absence of a finding that the mother is an unfit person,* and awarding the care and custody to the child's paternal grandmother, is reversed *under the record presented.*" (Emphasis supplied)

Particularly in view of this plaintiff's emphatic denial of paternity of the female child involved herein, and the trial court's finding, in connection with its awarding the custody of the female child to the mother, that the plaintiff did not want her custody, we cannot ascribe to that award the effect claimed for it by the defendant herein. See Perry v. Perry (1965), Okl., 408 P.2d 285, 287 and 288, which involved a similar situation.

In its temporary custody order of August 17, 1966, the trial court expressly found that the defendant was not a fit and proper person to have the custody of the parties' only child at the time. It is clear, from the order and proceedings of that date, that the trial court awarded the temporary custody of the boy to the plaintiff's parents, instead of to the plaintiff, because the plaintiff was in military service and stated that he would leave the boy with his paternal grandparents if custody be awarded to

him, and the plaintiff and his parents were willing for the boy's custody to be placed in the plaintiff's parents. Looking toward the trial and the making of an order concerning the permanent custody of the boy, it was stipulated by the parties, at the close of the hearing on August 17, 1966, and at the suggestion of the trial judge, that the trial judge might make such independent investigation of the situation as he might determine to make in the meantime, without making any report of such investigation and with the parties waiving any right to examine, or cross-examine, any one involved in such investigation. Between the date of that hearing and the date of the trial, the defendant had, on February 1, 1967, presented to the trial court her motion to modify the order of August 17, 1966, so as to award the boy's custody to her, on the ground of a material change in the conditions and circumstances surrounding the parties, since August 17, 1966, but the trial court denied that motion. At the trial on the merits, on June 6, 1967, the defendant made no attempt to show that the conditions had so changed that she then was a fit and proper person to have the boy's custody. The record of the proceedings had on August 17, 1966, became a part of the evidence before the court at the trial of the merits and, of course, the trial court could take judicial notice of its findings contained in its custody order of August 17, 1966. The journal entry of the judgment on the merits discloses that the trial court expressly "merged" all prior orders made in the case into that judgment.

We think that, insofar as a finding of the unfitness of the mother may have been necessary to the awarding of the boy's custody to its grandparents, there was a finding implicit in the court's final decree at least sufficient to render the cases relied upon by the defendant inapplicable. Even disregarding the trial court's basic finding that it would be for the best interests of the boy that his custody be awarded to his paternal grandparents— which basic finding is ignored by the de-

fendant—this disposes of the defendant's contention that such award was based entirely and solely upon a finding that, by comparison with the child's surroundings in the custody of its mother, his surroundings would be more stable and wholesome in the custody of its paternal grandparents. Furthermore, we think that, if the trial court intended for the expression "comparatively stable and wholesome surroundings" to denote a comparison between any two surroundings (rather than to denote a degree of stability and wholesomeness somewhere between minimal and maximal), the comparison could just as well be with the child's surroundings if he were in the personal custody of his father while in military service, especially overseas.

█ In spite of any secondary rules which may have been stated by this court with respect to particular circumstances which may have existed in other cases, the best interest of the child should be the primary consideration of the court in the determination of the custody of a minor child in a divorce action, and, where it does not appear that the trial court has abused its discretion, this court will not reverse the order of the trial court. This primary rule is applicable to the modification of an order concerning the custody of a child [Eby v. Eby (1959), Okl., 347 P.2d 1036; Wills v. Wills (1960), Okl., 349 P.2d 1; Davis v. Davis (1960), Okl., 355 P.2d 572; Sinclair v. Sinclair (1964), Okl., 392 P.2d 750; Conrad v. Conrad, now Tillison (1968), Okl., 443 P.2d 110], as well as to the initial order concerning custody [Perry v. Perry (1965), Okl., 408 P.2d 285; Phillips v. Phillips (1954), Okl., 267 P.2d 597; Roemer v. Roemer (1962), Okl., 373 P.2d 55; Waller v. Waller (1968), Okl., 439 P.2d 952; Mobley v. Mobley (1954), Okl., 277 P.2d 662].

█ We do not think that any good purpose would be served by discussing the evidence involved, which was somewhat in conflict, other than to say that there was testimony indicating that, when living away from the homes of the parents of the parties, the defendant gave very little care or attention to her children or to their living quarters. We have considered all of the evidence and have weighed it as best we could without the benefit of observing and hearing the witnesses on the stand, and cannot say that the trial court's finding that this child's best interest would be served by awarding his custody to his paternal grandparents is clearly against the weight of the evidence, or that the trial court abused its discretion in awarding the child's custody to his paternal grandparents, subject to the visitation provided for in the order.

The defendant's contentions are denied.

In his cross-appeal herein, the plaintiff contends that the trial court erred in holding that the plaintiff is the father of the female child born to the defendant on March 18, 1967.

The plaintiff was in Konawa, Oklahoma, on a 30-day leave when the male child involved in this case was born on February 20, 1966, left Konawa on March 10, 1966, for his duty station in Germany, and had no more personal contact with the defendant until July 26, 1966, when he was back in the Konawa area on leave. The parties spent five nights, four days and parts of two other days together, and the defendant testified that they had sexual intercourse during that period. They separated on July 31, 1966, and the plaintiff filed his petition for divorce on August 4, 1966. After the trial court was informed that the defendant was with child, it refused to try the cause until after the birth of the child. The child in question was born during the marriage of the parties.

10 O.S.1961 §§ 1, 2 and 3 provide, respectively, as follows:

"All children born in wedlock are presumed to be legitimate."

"All children of a woman who has been married, born within ten months after the dissolution of the marriage are pre-

sumed to be legitimate children of the marriage. A child born before wedlock becomes legitimate by the subsequent marriage of its parent."

"The presumption of legitimacy can be disputed only by the husband or wife or the descendent of one or both of them. Illegitimacy in such a case may be proved like any other fact."

In the 1923 case of In re Tinker's Estate, 91 Okl. 21, 215 P. 779, it is said that these statutes evidence the intent and purpose of the law-making power to protect and safeguard the name and fame of such children, so far as possible, from any attempts to question their legitimacy; and, in Mayse v. Newman et al. (1941), 189 Okl. 586, 118 P.2d 398, it is said that the presumption of legitimacy is one of the strongest presumptions of the law.

The plaintiff recognizes the statutory presumption of the legitimacy of all children born in wedlock and the principle, stated by this court in cases such as Stone v. Stone (1944), 193 Okl. 458, 145 P.2d 212; Winget v. Winget (1949), 202 Okl. 298, 213 P.2d 288, and Secondine v. Secondine (1957), Okl., 311 P.2d 215, that this statutory presumption of legitimacy can be overcome only by satisfactory, strong, convincing and *conclusive* evidence that the husband could not have been the father of the child. We note that, in connection with the application of this principle in the case of In re Asbury's Estate (1943), 192 Okl. 440, 136 P.2d 913, 915 and 916, this court approved statements from Virginia and Georgia cases, cited therein, to the effect that, in such cases, nothing short of proof of impossibility can be allowed to impugn the legitimacy of the child. This is but another—although more emphatic—way of saying that, in cases such as this, the presumption of legitimacy can be overcome only by satisfactory, strong, convincing and conclusive evidence that the husband could not have been the father of the child, and is in complete harmony with the intent and purpose of the statutes cited above and

the statement in Mayse v. Newman et al., supra, that the statutory presumption of legitimacy is one of the strongest presumptions of the law.

The plaintiff contends that the medical evidence in the present case proves, clearly and conclusively, that, according to "the laws of nature," the female child involved herein could not have been conceived before the plaintiff left Konawa, on March 10, 1966, for his duty station in Germany, or during the five-day period from July 26, 1966, through July 30, 1966, during which the parties cohabited shortly before the plaintiff filed his petition for divorce.

In this connection, the plaintiff relies upon the hospital records of Valley View Hospital, Ada, Oklahoma, (which were admitted in evidence), concerning the birth and hospital care of "Baby Girl Frankovich," and the testimony of an Ada physician who had had many years of experience in the field of pediatrics but who stated that he had had no experience in the field of obstetrics. He stated that he had not seen the child in question, but, on the morning of the trial, had examined the above-mentioned hospital records (which showed, among other things, that the subject was born in that hospital on March 18, 1967, and weighed eight pounds, one and one-half ounces at birth). He testified that in the field of medicine the accepted "normal" period of gestation in human beings (which, he stated, on cross-examination, was the "average" length of time from the fertilization of the ovum to the delivery, alive, of the child) is 280 days; that, while there are other factors which indicate a "premature" baby, weight at birth is the principal factor involved, and that any baby which weighs five and one-half pounds, or less, at birth, is considered to be a "premature" baby; that, when he sees a baby that weighs eight pounds, one ounce, at birth, he would from that fact alone consider it to be a "full-term" infant; that, assuming that a particular child born on March 18, 1967, was a "full-term" baby, and using the "normal" gestation period of

280 days—that is, going back 280 days from that date—the date of conception would have been June 11, 1966, plus or minus two or three days; that, likewise, assuming conception on July 26, 1966, and using the "normal" gestation period of 280 days, the "expected" date of delivery would be May 2, 1967, plus or minus two or three days (which, of course, is a basic difference of 45 days).

This doctor, who was the only medical witness used by either party on the question of the paternity of the baby girl, testified on cross-examination that medical science cannot be positive about how much weight a baby normally gains per day, or per week, or per month, during gestation; that, with different mothers having different body and chemistry characteristics, babies will develop, in weight, at different rates, and some mothers will deliver smaller babies than some smaller mothers and some mothers will deliver larger babies than some larger mothers; that some babies weigh in excess of ten pounds at birth; that length at birth is another factor sometimes used in defining what is considered to be a "premature" baby, in that a length, at birth, of less than eighteen inches indicates a "premature" baby (an unidentified and unsigned notation, in an upper corner of the hospital's form for "Information for Birth Certificate," included in the hospital records for this baby, indicates a birth-length of twenty inches); that another factor is the looseness or tightness of the skin and whether it is rather fragile instead of having the normal oily consistency; that a "premature" baby is more apt than a "full-term" baby to have a sub-normal temperature for several days after birth (requiring that the baby be kept in an incubator for warmth), breathing difficulties (requiring the use of oxygen) lack of reflexes, and under the usual hospital routine, is not given any formula for several days; that these hospital records state that this baby was "normal" and cried spontaneously, and showed temperatures of a "full-term" baby and regular feedings of formula beginning twenty-four hours after birth, and do not indicate the use of oxygen or an incubator, or any feeding problems, or show anything which would indicate that the attending physician (for whom the witness expressed professional respect) considered the child to be a "premature" baby. He recognized that some babies are born after a gestation period of eleven months, but stated that they were "worse off" than those born at eight months. He also admitted that some babies weighing eight pounds at birth have respiratory difficulties, but added that he did not think that an eight-pound baby would have all of the other "premature" baby characteristics mentioned by him, and stated that, if you could assume an eight-pound baby having all of those characteristics (as he was asked to do), it was his opinion that the baby could not be considered to be a "premature" baby.

■ In an action of equitable cognizance, this court will examine the whole record and weigh the evidence and affirm the judgment of the trial court unless clearly against the weight of the evidence or contrary to law or established principles of equity; and, where a certain fact is required to be established by proof of a certain degree or character, the two rules must be taken and considered together, and, in such cases, this court will, in weighing the evidence, determine whether or not the proof conforms to the required standard. Nisbet v. Midwest Oil Corporation (1968), Okl., 451 P.2d 687.

■ Insofar as proof of the impossibility of the plaintiff's being the father of the female child is concerned, the testimony of the plaintiff's medical witness is not conclusive. While he did testify to the effect that, in his medical opinion, the hospital records concerning the birth and hospital care of the baby in question indicated that the baby was a "full-term" baby, as distinguished from one that is considered to be, and is cared for as, a "premature" baby, his testimony at least implies that unless a

baby weighs five and one-half pounds, or less, and measures less than eighteen inches in length at birth, it cannot be considered to be a "premature" baby and must be considered to be a "full-term" baby, as that term is apparently used by him to indicate one that has undergone the "normal," or "average," gestation period of 280 days (plus or minus two or three days—which we will not mention hereinafter). However, he did not testify that it would be an impossibility for a baby weighing five and one-half pounds or less and measuring less than eighteen inches in length at birth to have been conceived 280 days prior to its birth; he did not testify that it would be an impossibility for a baby weighing any more than five and one-half pounds and measuring eighteen inches or more in length at birth to have been conceived less than 280 days prior to its birth; and he did not testify that it would be an impossibility for a baby weighing eight pounds, one and one-half ounces, and measuring twenty inches in length at birth to have been conceived during a period 235 to 240 days (or any other number of days less than 280) prior to its birth.

Although the plaintiff's evidence might even indicate a probability, as well as a possibility, that the plaintiff is not the father of the female child involved herein, it does not constitute satisfactory, strong, convincing and conclusive evidence of the impossibility of the plaintiff's being the father of the child, so does not meet the standard required to overcome the statutory presumption that he is the father of this child born during his marriage to its mother. The trial court's judgment that the plaintiff is the father of the female child involved herein is not clearly against the weight of the evidence, and has not been shown to be contrary to law or established principles of equity.

This view makes it unnecessary for us to consider the plaintiff's remaining contention, that the trial court erred in overruling his motion to be allowed to provide a bond to supersede, during the pendency of his appeal on the question of paternity, the trial court's order for the payment of money for the support and maintenance of this female child.

Judgment affirmed.

IRWIN, C. J., and WILLIAMS, BLACKBIRD, JACKSON, and McINERNEY, JJ., concur.